TIMOTHY E. CARY, SBN 093608
CaryT@Stutmanlaw.com
**LAW OFFICES OF ROBERT A. STUTMAN, P.C.**
1260 Corona Pointe Court, Suite 306
Corona, California 92879
Telephone: (951) 387-4700 / Facsimile: (951) 963-1298

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

THE STANDARD FIRE INSURANCE COMPANY; TRAVELERS PROPERTY CASUALTY INSURANCE COMPANY; TRAVELERS COMMERCIAL INSURANCE COMPANY; CONSUMERS COUNTY MUTUAL INSURANCE COMPANY; TRAVELERS PERSONAL INSURANCE COMPANY; THE TRAVELERS HOME AND MARINE INSURANCE COMPANY; THE AUTOMOBILE INSURANCE COMPANY OF HARTFORD, CONNECTICUT; TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA; TRAVELERS PERSONAL SECURITY INSURANCE COMPANY; ST. PAUL PROTECTIVE INSURANCE COMPANY; THE CHARTER OAK FIRE INSURANCE COMPANY; TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA; THE PHOENIX INSURANCE COMPANY; FIDELITY AND GUARANTY INSURANCE COMPANY; THE TRAVELERS INDEMNITY COMPANY; TRAVELERS INDEMNITY COMPANY OF CONNECTICUT; THE TRAVELERS INDEMNITY COMPANY OF AMERICA; TRAVCO INSURANCE COMPANY; TRAVELERS CASUALTY COMPANY OF CONNECTICUT;

CASE NO.

**COMPLAINT FOR DAMAGES**

**JURY TRIAL DEMANDED**

1   FIRST FLORIDIAN AUTO AND
    HOME INSURANCE COMPANY;
2   FIDELITY AND GUARANTY
    INSURANCE UNDERWRITERS
3   INC.; SELECTIVE AUTO
    INSURANCE COMPANY OF NEW
4   JERSEY; SELECTIVE INSURANCE
    COMPANY OF AMERICA;
5   SELECTIVE INSURANCE
    COMPANY OF SOUTH CAROLINA;
6   SELECTIVE INSURANCE
    COMPANY OF THE SOUTHEAST;
7   MUTUAL OF ENUMCLAW
    INSURANCE COMPANY;
8   ENUMCLAW PROPERTY AND
    CASUALTY INSURANCE
9   COMPANY; THE CINCINNATI
    INSURANCE COMPANY; THE
10  CINCINNATI CASUALTY
    COMPANY; THE CINCINNATI
11  INDEMNITY COMPANY;
    DAIRYLAND COUNTY MUTUAL
12  INSURANCE COMPANY OF
    TEXAS; DAIRYLAND NATIONAL
13  INSURANCE COMPANY;
    DAIRYLAND INSURANCE
14  COMPANY; MIDDLESEX
    INSURANCE COMPANY; PATRIOT
15  GENERAL INSURANCE COMPANY;
    PEAK PROPERTY & CASUALTY
16  INSURANCE CORPORATION;
    SENTRY INSURANCE COMPANY;
17  VIKING INSURANCE COMPANY
    OF WISCONSIN; and GUIDEONE
18  MUTUAL INSURANCE COMPANY,

19          Plaintiffs,

20        vs.

21  HYUNDAI MOTOR AMERICA;
    HYUNDAI MOTOR COMPANY; KIA
22  AMERICA, INC.; and KIA
    CORPORATION,

23          Defendants.

24  This Document Relates to:

25
    In re: KIA and HYUNDAI
26  IMMOBILIZER PRODUCTS
    LIABILITY LITIGATION
27

28

Case No.
COMPLAINT FOR DAMAGES

**STUTMAN**

## PLAINTIFFS' SUBROGATION COMPLAINT AND JURY DEMAND

Plaintiffs, by and through their counsel, Law Offices of Robert A. Stutman, P.C., bring this action against Hyundai Motor America, Hyundai Motor Company, Kia America, Inc., and Kia Corporation (collectively "Defendants").

## NATURE OF THE CASE

1. This action concerns the inappropriate and defective nature of certain vehicles designed, assembled, marketed, supplied and sold by Defendants, and Defendants' misconduct in concealing and/or failing to warn consumers about the theft problems with their vehicles.

2. The specific vehicles at issue in this action are: all 2011-2022 Kia vehicles or 2011-2022 Hyundai vehicles which do not contain an engine immobilizer (hereinafter, the "Vehicles").[1]

3. As detailed herein, Defendants failed to design, manufacture and/or sell the Vehicles with any reasonable antitheft feature or design element that would prevent the Vehicles from being easily started, driven, steered and otherwise operated, without a key. This defect constitutes a significant security vulnerability and makes the Vehicles dangerously easy to steal.

4. Specifically, design flaws in the Vehicles allow thieves to steal the Vehicles in less than ninety seconds because the Vehicles do not contain engine immobilizers or any other meaningful antitheft design features. These design flaws are collectively referred to herein as the "Theft Prone Defect."

5. Plaintiffs, as identified in the above caption, consist of insurance companies that insured purchasers or lessees of the Vehicles who incurred damages or losses after the Vehicles were stolen or attempted to be stolen (hereinafter referred to as "Plaintiffs' Insureds").

---

[1] Plaintiffs reserve the right to amend the Vehicles at issue as more information is learned throughout discovery.

Case No.

6.     Due to the Defendants' failure to have an appropriate antitheft system, Plaintiffs paid for covered damages sustained by Plaintiffs' Insureds as a result of theft, attempted theft, or other related damage to the Vehicles or other property in accordance with the terms and conditions of the insurance policies issued by Plaintiffs to their Insureds.  Plaintiffs are now legally, equitably and contractually subrogated to the rights of their Insureds to the extent of their payments as against any party legally responsible for causing the Insureds' damages, including Defendants.

## PLAINTIFFS

7.     Plaintiff, THE STANDARD FIRE INSURANCE COMPANY, is a corporation organized under the laws of the State of Connecticut, with a principal place of business located at One Tower Square, Hartford, CT 06183.

8.     Plaintiff, TRAVELERS PROPERTY CASUALTY INSURANCE COMPANY, is a corporation organized under the laws of the State of Connecticut, with a principal place of business located at One Tower Square, Hartford, CT 06183.

9.     Plaintiff, TRAVELERS COMMERCIAL INSURANCE COMPANY, is a corporation organized under the laws of the State of Connecticut, with a principal place of business located at One Tower Square, Hartford, CT 06183.

10.    Plaintiff, CONSUMERS COUNTY MUTUAL INSURANCE COMPANY, is a corporation organized under the laws of the State of Texas, with principal places of business located at 4245 North Central Expressway, Suite 500, Dallas, TX 75205, and One Tower Square, Hartford, CT 06183.

11.    Plaintiff, TRAVELERS PERSONAL INSURANCE COMPANY, is a corporation organized under the laws of the State of Connecticut, with a principal place of business located at One Tower Square, Hartford, CT 06183.

12.    Plaintiff, THE TRAVELERS HOME AND MARINE INSURANCE COMPANY, is a corporation organized under the laws of the State of Connecticut, with a principal place of business located at One Tower Square, Hartford, CT 06183.

13.    Plaintiff, THE AUTOMOBILE INSURANCE COMPANY OF

4

HARTFORD, CONNECTICUT, is a corporation organized under the laws of the State of Connecticut, with a principal place of business located at One Tower Square, Hartford, CT 06183.

14.     Plaintiff, TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, is a corporation organized under the laws of the State of Connecticut, with a principal place of business located at One Tower Square, Hartford, CT 06183.

15.     Plaintiff, TRAVELERS PERSONAL SECURITY INSURANCE COMPANY, is a corporation organized under the laws of the State of Connecticut, with a principal place of business located at One Tower Square, Hartford, CT 06183.

16.      Plaintiff, ST. PAUL PROTECTIVE INSURANCE COMPANY, is a corporation organized under the laws of the State of Connecticut, with a principal place of business located at One Tower Square, Hartford, CT 06183.

17.     Plaintiff, THE CHARTER OAK FIRE INSURANCE COMPANY, is a corporation organized under the laws of the State of Connecticut, with a principal place of business located at One Tower Square, Hartford, CT 06183.

18.     Plaintiff, TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA, is a corporation organized under the laws of the State of Connecticut, with a principal place of business located at One Tower Square, Hartford, CT 06183.

19.     Plaintiff, THE PHOENIX INSURANCE COMPANY, is a corporation organized under the laws of the State of Connecticut, with a principal place of business located at One Tower Square, Hartford, CT 06183.

20.     Plaintiff, FIDELITY AND GUARANTY INSURANCE COMPANY, is a corporation organized under the laws of the State of Iowa, with principal places of business located at 1089 Jordan Creek, Ste. 300, West Des Moines, IA 50266, and One Tower Square, Hartford, CT 06183.

21.     Plaintiff, THE TRAVELERS INDEMNITY COMPANY, is a corporation organized under the laws of the State of Connecticut, with a principal place of business located at One Tower Square, Hartford, CT 06183.

22. Plaintiff, TRAVELERS INDEMNITY COMPANY OF CONNECTICUT, is a corporation organized under the laws of the State of Connecticut, with a principal place of business located at One Tower Square, Hartford, CT 06183.

23. Plaintiff, THE TRAVELERS INDEMNITY COMPANY OF AMERICA, is a corporation organized under the laws of the State of Connecticut, with a principal place of business located at One Tower Square, Hartford, CT 06183.

24. Plaintiff, TRAVCO INSURANCE COMPANY, is a corporation organized under the laws of the State of Connecticut, with a principal place of business located at One Tower Square, Hartford, CT 06183.

25. Plaintiff, TRAVELERS CASUALTY COMPANY OF CONNECTICUT, is a corporation organized under the laws of the State of Connecticut, with a principal place of business located at One Tower Square, Hartford, CT 06183.

26. Plaintiff, FIRST FLORIDIAN AUTO AND HOME INSURANCE COMPANY, is a corporation organized under the laws of the State of Florida, with principal places of business located at 1 N. Dale Mabry Hwy., Ste. 1300, Tampa, FL 33609, and One Tower Square, Hartford, CT 06183.

27. Plaintiff, FIDELITY AND GUARANTY INSURANCE UNDERWRITERS INC., is a corporation organized under the laws of the State of Wisconsin, with principal places of business located at 13935 Bishops Drive, Brookfield, WI 53005, and One Tower Square, Hartford, CT 06183.

28. Plaintiff, SELECTIVE AUTO INSURANCE COMPANY OF NEW JERSEY, is a corporation organized under the laws of the State of New Jersey, with a principal place of business located at 40 Wantage Ave., Branchville, NJ 07890.

29. Plaintiff, SELECTIVE INSURANCE COMPANY OF AMERICA, is a corporation organized under the laws of the State of New Jersey, with a principal place of business located at 40 Wantage Ave., Branchville, NJ 07890.

30.     Plaintiff, SELECTIVE INSURANCE COMPANY OF SOUTH CAROLINA, is a corporation organized under the laws of the State of Indiana, with a principal place of business located at 900 E. 96th Street, Indianapolis, IN 46240.

31.     Plaintiff, SELECTIVE INSURANCE COMPANY OF THE SOUTHEAST, is a corporation organized under the laws of the State of Indiana, with a principal place of business located at 11711 N. Meridian St., Ste. 800, Carmel, IN 46032.

32.     Plaintiff, MUTUAL OF ENUMCLAW INSURANCE COMPANY, is a corporation organized under the laws of the State of Oregon, with a principal place of business located at 1460 Wells Street, Enumclaw, WA 98022.

33.     Plaintiff, ENUMCLAW PROPERTY AND CASUALTY INSURANCE COMPANY, is a corporation organized under the laws of the State of Washington, with a principal place of business located at 1460 Wells Street, Enumclaw, WA 98022.

34.     Plaintiff, THE CINCINNATI INSURANCE COMPANY, is a corporation organized under the laws of the State of OH, with a principal place of business located at 6200 S. Gilmore Road, Fairfield, Ohio 45014.

35.     Plaintiff, THE CINCINNATI CASUALTY COMPANY, is a corporation organized under the laws of the State of Ohio, with a principal place of business located at 6200 S. Gilmore Road, Fairfield, OH 45014.

36.     Plaintiff, THE CINCINNATI INDEMNITY COMPANY, is a corporation organized under the laws of the State of Ohio, with a principal place of business located at 6200 S. Gilmore Road, Fairfield, OH 45014.

37.     Plaintiff, DAIRYLAND COUNTY MUTUAL INSURANCE COMPANY OF TEXAS, is a corporation organized under the laws of the State of Texas, with a principal place of business located at 1800 N. Point Dr. Stevens Point, WI 54481.

38.     Plaintiff, DAIRYLAND NATIONAL INSURANCE COMPANY, is a

corporation organized under the laws of the State of Wisconsin, with a principal place of business located at 1800 N. Point Dr. Stevens Point, WI 54481.

39.    Plaintiff, DAIRYLAND INSURANCE COMPANY, is a corporation organized under the laws of the State of Wisconsin, with a principal place of business located at 1800 N. Point Dr. Stevens Point, WI 54481.

40.    Plaintiff, MIDDLESEX INSURANCE COMPANY, is a corporation organized under the laws of the State of Wisconsin, with a principal place of business located at 1800 N. Point Dr. Stevens Point, WI 54481.

41.    Plaintiff, PATRIOT GENERAL INSURANCE COMPANY, is a corporation organized under the laws of the State of Wisconsin, with a principal place of business located at 1800 N. Point Dr. Stevens Point, WI 54481.

42.    Plaintiff, PEAK PROPERTY & CASUALTY INSURANCE CORPORATION, is a corporation organized under the laws of the State of Wisconsin, with a principal place of business located at 1800 N. Point Dr. Stevens Point, WI 54481.

43.    Plaintiff, SENTRY INSURANCE COMPANY, is a corporation organized under the laws of the State of Wisconsin, with a principal place of business located at 1800 N. Point Dr. Stevens Point, WI 54481.

44.    Plaintiff, VIKING INSURANCE COMPANY OF WISCONSIN, is a corporation organized under the laws of the State of Wisconsin, with a principal place of business located at 1800 N. Point Dr. Stevens Point, WI 54481.

45.    Plaintiff, GUIDEONE MUTUAL INSURANCE COMPANY, is a corporation organized under the laws of the State of Iowa, with a principal place of business located at 1111 Ashworth Road, West Des Moines, IA 50265.

## **DEFENDANTS**

46.    Defendant, HYUNDAI MOTOR AMERICA ("HMA") is a California corporation with its principal place of business located at 10550 Talbert Avenue, Fountain Valley, CA 92708. HMA also maintains a 4,300-acre testing facility in

Irwindale, CA.  HMA engages in substantial business throughout the United States, including in this judicial district.

47.    HMA is a subsidiary of Defendant, Hyundai Motor Company ("HMC"), and is actively engaged in manufacturing, assembling, marketing, and distributing Hyundai vehicles sold in California and the rest of the United States.

48.    HMA's C-Suite, executives, and employees, who are responsible for the manufacture, development, distribution, marketing, sales, customer service, and warranty servicing of Hyundai vehicles, are located at the company's Fountain Valley headquarters in California.

49.    As detailed *infra*, the decisions regarding the marketing and sale of the Vehicles, the development and issuance of safety recalls and product updates, and decisions regarding the disclosure or non-disclosure of the Theft Prone Defect, were in whole or substantial part made by HMA at its California headquarters.

50.    HMA has 830 dealerships across the United States which serve as its agents to consumers, including Plaintiffs' Insureds.  For example, in HMA's announcement of its "Anti-Theft Software Upgrade," it instructs consumers to bring their Vehicles into "Hyundai dealers" for the update. Similarly, in unrelated recall notices to consumers, HMA instructs Vehicle owners and lessees to visit the "nearest Hyundai dealer" for defect repairs.[2]

51.    Defendant HMC is a South Korean corporation with its headquarters located in Seoul, South Korea.

52.    HMC is the parent corporation of HMA and owns a 33.88% stake in Defendant, Kia Corporation ("KC").

53.    Defendant, HMC promotes on its own website all Hyundai models sold by HMA in the United States and directs U.S. consumers to HMA's website.[3]

---

[2]https://static.nhtsa.gov/odi/rcl/2020/RCONL-20V543-0565.pdf (last accessed March 17, 2023).

[3]https://www.hyundai.com/worldwide/en/vehicles (last accessed March 17, 2023);

54.    HMC states in promotional materials that it "help[s] [its] overseas subsidiaries, sales corporations, and newly established enterprises in particular to establish the direction of their customer service strategies."[4]

55.    On information and belief, HMC and HMA control various details regarding their dealers' operations through various written agreements, such as: (i) granting each dealer a license to use their respective trademarks and intellectual property; (ii) furnishing each dealer with marketing materials to assist in the sale of their vehicles; (iii) providing training to dealership personnel to assist in their sales activities; and (iv) prohibiting their dealers from engaging in certain practices that otherwise detract from their respective brands or undermine the sale of their respective vehicles, including the Vehicles.

56.    Defendant, KIA AMERICA, INC. ("KA") (formerly Kia Motors America, Inc.), is a California corporation with its principal place of business located at 111 Peter Canyon Rd., Irvine, CA 92606. KA is a subsidiary of Defendant KC and is actively engaged in manufacturing, assembling, marketing, and distributing Kia vehicles sold in the United States.

57.    KA's C-Suite, executives, and employees, who are responsible for the manufacture, development, distribution, marketing, sales, customer service, and warranty servicing of Kia vehicles, are located at the company's Irvine headquarters in California. As detailed *infra*, the decisions regarding the marketing and sale of the Vehicles, the development and issuance of safety recalls and product updates, and decisions regarding the disclosure or non-disclosure of the Theft Prone Defect were in whole or substantial part made by KA at its California headquarters.

---

https://www.hyundai.com/worldwide/en/onepage/country.us (last accessed March 17, 2023).

[4]https://www.hyundai.com/content/dam/hyundai/ww/en/images/company/sustainability/about-sustainability/hmc-2022-sustainability-report-social-en.pdf (last accessed Aug. 24, 2022).

58.     Defendant KC is a South Korean corporation with its headquarters located in Seoul, South Korea.  KC is the parent corporation of KA.

59.     KC refers to the U.S. market as "the center of the global auto industry."[5] The United States is KC's most important market for the sale of its "Kia" branded vehicles. For example, in 2017, 21.4% of all vehicles sold by KC were sold in the United States, more than Korea (18.8%), Europe (17.1%), and China (14.3%).[6]

60.     On its own website, KC promotes Kia branded vehicles sold by KA in the United States.[7]

61.     KA has over 750 dealerships across the United States which serve as its agents to customers, including Plaintiffs' Insureds.[8] For example, KA tells customers that they must "bring their vehicle[s] to the nearest Kia dealership" in order to receive the "enhanced security software" designed to remedy the Theft Prone Defect.[9]

62.     On information and belief, KA and KC control various details regarding their dealers' operations through various written agreements, such as: (i) granting each dealer a license to use their respective trademarks and intellectual property; (ii) furnishing each dealer with marketing materials to assist in the sale of their vehicles; (iii) providing training to dealership personnel to assist in their sales activities; and (iv) prohibiting their dealers from engaging in certain practices that otherwise detract from their respective brands or undermine the sale of their respective vehicles, including the Vehicles.

63.     HMA and HMC are collectively referred to in this Complaint as

---

[5] 2011 KC Annual Report, available at https://worldwide.kia.com/int/company/ir/archive/annual-report.
[6] 2017 KC Annual Report, available at https://worldwide.kia.com/int/company/ir/archive/annual-report.
[7] *E.g.*, https://worldwide.kia.com/na/sportage (last accessed Aug. 24, 2022).
[8] https://www.prnewswire.com/news-releases/kia-america-completes-bestretail-sales-year-in-company-history-301713187.html (last accessed March 22, 2023).
[9] https://www.cbsnews.com/chicago/news/kia-software-update-auto-theft-crisis/(last accessed March 17, 2023).

Case No.

"Hyundai" unless identified separately.

64.     KA and KC are collectively referred to in this Complaint as "Kia" unless identified separately.

65.     HMA, HMC, KA, and KC are collectively referred to in this Complaint as "Defendants" unless identified separately.

## JURISDICTION AND VENUE

66.     This Court has general personal jurisdiction over Defendants because they conduct substantial business in California, and they intentionally and purposefully placed the Vehicles that are the subject of this action into the stream of commerce within California and elsewhere in the United States.

67.     Further, HMA and KA are headquartered in California.

68.     This Court has subject matter jurisdiction over this matter based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a), as each Plaintiff is domiciled in a different state than all Defendants and the amount in controversy for multiple Plaintiffs is in excess of $75,000, exclusive of interest and costs.   *Exxon Mobil Corporation v. Allapattah Services, Inc.*, 535 U.S. 546, 547 (2005) ("[w]hen a well-pleaded complaint has at least one claim satisfying the amount-in-controversy, and there are no other relevant jurisdictional defects, the district court, beyond all question, has original jurisdiction over that claim.")

69.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) as all Defendants do substantial business in this judicial district, including the selling of the Vehicles at issue herein.

## FACTUAL ALLEGATIONS

**A. Hyundai and Kia Became One of The Most Popular Automakers In The United States By Promoting The Safety, Quality, and Reliability of Their Vehicles.**

70.     HMC was established in South Korea in 1967 and started selling vehicles in the United States in 1986 through its subsidiary HMA. Since that time, HMC has

become one of the largest automakers in the United States and around the world.

71.    KC was founded in 1944 manufacturing bicycles and motorcycles and is Korea's oldest manufacturer of motor vehicles. KA was formed in 1992 when KC first imported its vehicles into the United States.

72.    In 1999 HMC announced that it acquired a controlling interest in KC, and that KC would obtain an ownership interest in approximately twenty-two (22) HMC subsidiaries. In subsequent years, HMC divested a portion of its interest and currently controls approximately 34% of KC.

73.    Through its network of more than 800 dealerships nationwide, HMA sells and services its vehicles, including the Hyundai Elantra (Hyundai's bestselling model), Hyundai Santa Fe, Hyundai Tucson, and Hyundai Accent. Likewise, KA sells and services a complete line of vehicles in the U.S. through its own network of over 700 dealers.

74.    Today, over half the cars HMC sells in the United States are designed and manufactured domestically at HMA's facilities, including at its "design, research, and testing grounds in California" near its corporate headquarters.[10] In total, HMC and HMA employ approximately 5,000 people at these facilities, and an additional 20,000 employees at U.S. dealerships.

75.    Hyundai and Kia branded vehicles share many of the same components and the same group of engineers work on Hyundai and Kia vehicles at Hyundai-KA Technical Center, Inc. ("HATCI").[11]  HATCI serves as an "authorized representative" for HMC, HMA, KC, and KA when dealing with NHTSA in connection with various Safety Standards.

---

[10] https://www.hyundainews.com/en-us/about-us (last accessed Aug. 26, 2022).
[11] https://www.forbes.com/sites/jimhenry/2013/05/31/balancing-act-hyundaiand-kia-share-products-under-the-skin-but-must-avoid-blurring-identities/?sh=210585421c7a (last accessed Aug. 26, 2022);
https://www.hyundainews.com/enus/releases/398 (last accessed July 14, 2021).

Case No.

76.     Within the United States alone, HMA sold an average of 625,264 vehicles per year since 2006, approximately 4.13% of the total U.S. market.[12]

77.     Over the same time period, KA sold an average of 500,351 vehicles per year, or approximately 3.3% of the U.S. market.[13]

78.     Additionally, a recent report by McKinsey & Company found that over twice as many second-owned used vehicles are sold in the United States each year compared to new vehicles.[14]

79.     On HMC's webpage devoted to promoting its vehicles sold around the world, including those sold by HMA, HMC touts the safety of its vehicles.[15] HMC advertises that "[f]rom the moment you step into a Hyundai Motor's vehicle, safety surrounds you from all corners at every second, even in places you never imagined."[16]

80.     HMC touts its continued improvement of quality and safety measures and how it conducts extensive post-sale monitoring of its vehicles, and it does so because HMC knows that safety and quality are material to consumers:[17]

> *[W]e continue upgrading overall quality and safety systems not only by promoting preemptive quality and safety measures from the vehicle development stage, but also by preventing any significant problems afterward*

---

[12] https://carsalesbase.com/us-hyundai/ (last accessed Aug. 24, 2022).

[13] https://carsalesbase.com/us-kia/ (last accessed Aug. 25, 2022).

[14] https://www.mckinsey.com/industries/automotive-and-assembly/our-insights/used-cars-newplatforms-accelerating-sales-in-a-digitally-disrupted-market# (last accessed Aug. 24, 2022).

[15] *E.g.*, https://www.hyundai.com/worldwide/en/suv/tucson-2021/safety (last accessed Aug. 24, 2022).

[16] https://www.hyundai.com/worldwide/en/company/innovation/safety/research (last accessed Aug. 24, 2022).

[17] https://www.hyundai.com/content/dam/hyundai/ww/en/images/company/sustainability/about-sustainability/hmc-2022-sustainability-report-social-en.pdf (last accessed Aug. 24, 2022).

*through early detection, early improvement and early after-sales actions.* In particular, we will establish a sustainable safety management system designed to maximize customer satisfaction and strengthen trust by developing quality and safety training programs, operating quality and safety reporting centers, analyzing safety information, and establishing safety test sites.

81.    Likewise, KA advertises that it "believe[s] in the outstanding quality and durability of every new Kia that rolls off the assembly line" and that "[f]rom design to technology, materials to safety features, Kia continues to innovate[.]"[18]

82.    KA states on its website that it works "tirelessly to ensure [its] vehicle safety features are designed to help [its] drivers handle or avoid the unexpected."[19] KA claims that "Kia engineers are passionate about producing vehicles that are exceptionally well designed and reliable. Their dedication to quality and attention to detail give Kia the confidence to back every model with an industry leading warranty program."[20]

83.    KA's Warranty and Consumer Information Manual and promotional materials for Kia Vehicles similarly promote its purported dedication to safety.

84.    Defendants also affix to each Vehicle a label or tag certifying that the vehicle "complies with applicable motor vehicle safety standards[.]" On information and belief, each Vehicle contained this label. Below is a sample certification label affixed by KC to a 2015 Kia Optima Vehicle prior to its sale in the United States, in which it represents that "this vehicle conforms to all applicable U.S.A. federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of

---

[18] https://www.kia.com/us/en/why-kia (last accessed Aug. 26, 2022).

[19] https://www.kia.com/us/en/why-kia (last accessed March 22, 2023).

[20] https://manualzz.com/doc/7136122/kia-2015-sorento-brochure---dealer-e (last accessed Aug. 26, 2022).

Case No.

manufacture…":



**B. For Over Fifty Years, Auto Thefts Have Been Known to Pose a Serious Safety Risk.**

85.     It is well-established that auto thefts pose a serious safety risk to vehicle owners and bystanders. In 1966, Congress enacted the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), 49 U.S.C. § 30101 *et seq*., "to reduce traffic accidents and deaths and injuries resulting from traffic accidents" and "to prescribe motor vehicle safety standards."

86.     In 1968, the DOT promulgated a new Safety Standard No. 114 (FMVSS No. 114) titled "Theft Protection; Passenger Cars," pursuant to the Safety Act. *See* 33 Fed. Reg. 6,471 (Apr. 27, 1968).

87.     FMVSS No. 114 was implemented after it was "demonstrated that ***stolen cars constitute a major hazard to life and limb on the highways.***" *Id.* (emphasis added). As part of its evaluation of FMVSS No. 114, the DOT found that "[t]he evidence shows that cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals." *Id*.

88.     Among the evidence used in support of this conclusion was a 1968 study conducted by the Department of Justice ("DOJ"). The DOJ found that a substantially

Case No.
COMPLAINT FOR DAMAGES

significant number of stolen vehicles would result in personal injury accidents:

> [T]here were an estimated 94,000 stolen cars involved in accidents in 1966, and more than 18,000 of these accidents resulted in injury to one or more people. On a proportionate basis, 18.2 percent of the stolen cars became involved in accidents, and 19.6 percent of the stolen-car accidents resulted in personal injury. The same study predicted that automobile thefts in 1967 total about 650,000; about 100,000 of these stolen cars could be expected to become involved in highway accidents. ***Comparing these figures with statistics for vehicles which are not stolen, the approximate rate for stolen cars would be some 200 times the normal accident rate for other vehicles***.

*Id.*

89.     The DOJ survey found that "[t]he number of car thieves who start cars with so-called 'master keys' and devices which bypass the lock is … large enough to produce a significant safety hazard." *Id.* Accordingly, FMVSS No. 114 was explicitly designed to "defeat" this method for stealing a vehicle and requires "[a] large number of locking-system combinations and a steering or self-mobility lock." *Id.*

90.     When promulgating FMVSS No. 114, the DOT rejected several comments in opposition to the Standard that argued that "since any locking system, no matter how it is constructed, can be defeated by persons possessing sufficient skill, equipment, and tenacity, provisions for ensuring removal of ignition keys would be futile because a thief need not make use of a key." *Id.* In particular, the DOT relied on the DOJ study which found that "the large majority of car thieves are amateurs, almost half of whom are engaged in so-called 'joy-riding'" and that "most" of the thieves are juveniles. *Id.* This finding would be shown to be a prescient warning to automobile manufacturers and just as relevant fifty years later.

91.    Given the dramatic increase in the accident rate caused by stolen vehicles, the DOT determined that "*a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety*. It would not only reduce the number of injuries and deaths among those who steal cars, it would also protect the many innocent members of the public who are killed and injured by stolen cars each year." *Id.* (emphasis added). Further, the DOT "concluded that a standard that would reduce the incidence of unauthorized use of cars meets the need for motor vehicle safety" and rejected the contention that the Theft Protection rules are "not related to improving motor vehicle safety." *Id*.

92.    The first iteration of FMVSS No. 114, Theft Protection; Passenger Cars, stated in relevant part:

S1.    *Purpose and scope*. This standard specifies requirements for theft protection to reduce the incidence of accidents resulting from unauthorized use.

S2. *Application*. This standard applies to passenger cars.

S4. *Requirements*.

**S4.1 Each passenger car shall have a key-locking system that, whenever the key is removed, will prevent- (a) Normal activation of the car's engine or other main source of motive power; and (b) Either steering or self-mobility of the car, or both.**

S4.2 The prime means for deactivating the car's engine or other main source of motive power shall not activate the deterrent required by S4.1(b).

S4.3 The number of different combinations of the key locking systems required by S4.1 of each manufacturer shall be at least 1,000, or a number equal to the number of passenger cars manufactured by such manufacturer,

Case No.

whichever is less.

S4.4 A warning to the driver shall be activated when the key required by S4.1 has been left in the locking system and the driver's door is opened.

*Id.* The standard became effective on January 1, 1970. *See id.*

93.    In the half century since the DOT recognized the safety risks posed by auto thefts, the agency has continued to monitor the safety risks posed by auto thefts and modernize its rules designed to prevent auto thefts.

94.    In 1984, Congress enacted the Motor Vehicle Theft Law Enforcement Act (the "Theft Act"), 49 U.S.C. 33101, *et seq*., which directs NHTSA to establish theft prevention standards for passenger vehicles. *See* 81 Fed. Reg. 66,833, 66,834 (Sept. 29, 2016). Pursuant to the Theft Act, NHTSA implemented 49 C.F.R. Part 541, which requires manufacturers of designated high-theft passenger car lines to inscribe or affix the Vehicle Identification Number (VIN) onto the engine, the transmission, and major body parts. Each vehicle in a high-theft line must have its major parts and major replacement parts marked unless the vehicle line is granted an exemption from the parts marking requirements ("PMR"). A manufacturer may petition for a PMR exemption when it plans to install a standard equipment antitheft device on the entire line. *See* 49 C.F.R. §§ 543.1, *et seq*. The agency must determine that the antitheft device to be installed on the line is likely to be as effective in reducing and deterring motor vehicle theft as parts-marking.

95.    In 1992, Congress enacted the Anti Car Theft Act (Pub. L. No. 102- 519, codified at 49 U.S.C. chapter 331), which expanded the PMR to include multipurpose passenger vehicles and certain light duty trucks. On April 6, 2004, the Federal Motor Vehicle Theft Prevention Standard was extended to include all passenger cars, multipurpose passenger vehicles with a gross vehicle weight rating (GVWR) of 6,000 pounds or less, all light-duty trucks (LDTs) determined to be high-theft (with a gross vehicle weight rating of 6,000 pounds or less), and all low theft LDTs with major

parts that are interchangeable with a majority of the covered major parts of those passenger motor vehicle lines subject to the theft prevention standard. 69 Fed. Reg. 17,960 (Apr. 6, 2004).

96. In 2006, NHTSA iterated that its "safety standard on theft protection [FMVSS No. 114] specifies vehicle performance requirements intended to reduce the incidence of crashes resulting from theft and accidental rollaway of motor vehicles." *See* 71 Fed. Reg. 17,752 (Apr. 7, 2006). NHTSA goes on to make clear that "the standard sought to ensure that the vehicle could not be easily operated without the key" and that "thieves… could [not] bypass the ignition lock." *Id.* at 17,752-53.

97. The ignition lock (also referred to as an ignition cylinder or lock cylinder) is the portion of the ignition assembly where the key is inserted. The ignition lock prevents the ignition switch, which is located behind the ignition lock, from turning to start the vehicle without the right key.

98. If the correct key is inserted, small actuators in the lock cylinder will match up with the key and allow the driver to turn it; a process that, in turn, rotates the vehicle's ignition switch, thereby starting the vehicle.

99. FMVSS No. 114 is currently codified as 49 C.F.R. 571.114, which provides:

> **S1. Scope**. This standard specifies vehicle performance requirements intended to reduce the incidence of crashes resulting from theft and accidental rollaway of motor vehicles.
>
> **S2. Purpose**. The purpose of this standard is to decrease the likelihood that a vehicle is stolen, or accidentally set in motion.
>
> **S3. Application**. This standard applies to all passenger cars, and to trucks and multipurpose passenger vehicles with a GVWR of 4,536 kilograms (10,000 pounds) or less.

Case No.

However, it does not apply to walk-in van-type vehicles. Additionally, paragraph S5.3 of this standard applies to all motor vehicles, except trailers and motorcycles, with a GVWR of 4,536 kilograms (10,000 pounds) or less.

**S4. Definition**s.

*Combination* means a variation of the key that permits the starting system of a particular vehicle to be operated.

*Key* means a physical device or an electronic code which when inserted into the starting system (by physical or electronic means), enables the vehicle operator to activate the engine or motor.

...

*Starting system* means the vehicle system used in conjunction with the key to activate the engine or motor.

**S5 Requirements**. Each vehicle subject to this standard must meet the requirements of S5.1, S5.2, and S5.3. Open-body type vehicles are not required to comply with S5.1.3.

**S5.1 Theft protection.**

S5.1.1 Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents:

(a)  The normal activation of the vehicle's engine or motor; and

(b)  Either steering, or forward self-mobility, of the vehicle, or both.

100.    FMVSS No. 114 is a "self-certification" process.[21] In other words,

---

[21] *See*

COMPLAINT FOR DAMAGES

Case No.

"NHTSA does not issue type approval certifications and does not certify any motor vehicles or motor vehicle equipment as complying with applicable FMVSS."

101.   NHTSA is also required to periodically obtain and publish accurate and reliable theft data. 49 U.S.C. 33104(b)(4) (Designation of high theft vehicle lines and parts). The National Crime Information Center ("NCIC") of the Federal Bureau of Investigation provides this data to NHTSA. The NCIC is a governmental system that receives vehicle theft data from approximately 23,000 criminal justice agencies and other law enforcement authorities throughout the United States. This national data includes the reported thefts of self-insured and uninsured vehicles, not all of which are reported to other data sources.

102.   In connection with fulfilling its administrative mandate under both the Safety Act and the Theft Act, NHTSA regularly interacts with, seeks comment from, and shares information with, automotive manufacturers and their authorized representatives, including HMA and KA.

**C. Engine Immobilizers Are an Inexpensive and Proven Means to Dramatically Reduce Auto Theft.**

103.   Over the last fifty years since FMVSS No. 114 was issued, manufacturers have developed a bevy of safety features, many of which would have been inconceivable to drivers in 1968, and others which are directly contemplated by the initial promulgation of the Safety Standard. Falling into the latter category are engine immobilizers, which have become standard in consumer vehicles across the globe—including in Defendants' high-end vehicles and those sold outside the U.S. market.

104.   An immobilizer is an antitheft device that can prevent vehicles from starting unless a verified code is received by a transponder module that controls the

---

https://www.nhtsa.gov/sites/nhtsa.gov/files/manufacturer_information_march2014.pdf (last accessed March 24, 2023).

engine. *See* 81 Fed. Reg. 66,833 (Sept. 29, 2016). This theft-prevention device thus prevents the vehicle from being "hot-wired" or started by any means other than an authorized key. Engine immobilizers have been described as "simple and low-cost anti-theft device[s]."[22]

105.   Since 1986, there have been three popular engine immobilizing antitheft devices: resistor-pellet, transponder-based, and magnetic rotation device systems.

106.   Over the last three decades, these immobilizers have been proven to be highly effective in dramatically reducing auto theft.

107.   A study conducted in Europe, after immobilizers were mandated, found that the overall rate of auto thefts fell by 46% between 1995 and 2008.[23] The same study also found that the additional manufacturing costs related to installing an engine immobilizer was as little as approximately $50 per vehicle, and the benefits in terms of prevented thefts are many times higher than the costs of installing the device.

108.   Given how effective and relatively inexpensive engine immobilizers are, most automotive regulators around the globe require the installation of the device in new vehicles sold.

109.   In November of 1995, the European Union ("EU") adopted Directive 74/61/EEC, which made installation of an electronic engine immobilizer mandatory in all new passenger cars sold within the EU as of October, 1998.[24] Australia has required immobilizers in vehicles sold since 2001 and Canada has required the component since 2007. In parts of Australia and Canada, the legislation also extended

---

[22] van Ours, Jan C. and Vollaard, Ben, The Engine Immobilizer: A Non-Starter for Car Thieves (January 14, 2013). CentER Discussion Paper Series No. 2013-004, TILEC Discussion Paper No. 2013-001, available at SSRN: https://ssrn.com/abstract=2202165.

[23] van Ours, Jan C. and Vollaard, Ben, The Engine Immobilizer: A Non-Starter for Car Thieves (January 31, 2013). CESifo Working Paper Series No. 4092, available at SSRN: https://ssrn.com/abstract=2214895.

[24] van Ours, Jan C. and Vollaard, Ben, The Engine Immobilizer: A Non-Starter for Car Thieves (January 31, 2013).

to the existing car fleet.[25]

110.   NHTSA has repeatedly demonstrated its support for the installation of immobilizers and has stated that the device complies with FMVSS No. 114. In 2006, ***NHTSA noted that FMVSS No. 114 was promulgated due to the agency's "concern about car thieves who could bypass the ignition lock."*** 71 Fed. Reg. 17,752, 17,753. NHTSA went on to explain how a manufacturer's engine immobilizer satisfied FMVSS No. 114:

> We note that in promulgating FMVSS No. 114, the agency expressed concern about car thieves who could bypass the ignition lock. In response to this concern, the agency decided to require a device, which would prevent either self-mobility or steering even if the ignition lock were bypassed (see 33 FR 4471, April 27, 1968). The engine control module immobilizer described in your letter satisfies the requirements of S4.2(b) because it locks out the engine control module if an attempt is made to start the vehicle without the correct key or to bypass the electronic ignition system. When the engine control module is locked, the vehicle is not capable of forward self-mobility because it is incapable of moving forward under its own power.

*Id.*

111.   Since the introduction of engine immobilizers, the rate of auto thefts has fallen dramatically as demonstrated in the following table published by NHTSA in 2017 and detailing the theft rate in the United States from 1993 through 2014:

---

[25] *Id.*

Figure 1: Theft Rate Data Trend (MY/CY 1993-2014)

82 Fed. Reg. 28,246, 28247 (June 21, 2017).

112.   In a 2013 NHTSA report regarding the drop in the vehicle theft rate from 1993 through 2011, NHTSA noted that it "***believes that the theft rate reduction is a result of several factors, including*** vehicle parts marking; ***the increased use of standard antitheft devices and other advances in electronic technology (i.e., immobilizers) and theft prevention methods***; increased and improved prosecution efforts by law enforcement organizations; and, increased public awareness which may have contributed to the overall reduction in vehicle thefts." 78 Fed. Reg. 41,016, 41,017 (July 9, 2013).

113.   Studies, of which the Defendants, as car manufacturers, were well aware, conducted by the Highway Loss Data Institute ("HLDI"), similarly found that "vehicle theft losses plunged after immobilizers were introduced."[26]

114.   The National Insurance Crime Bureau ("NICB"), an organization dedicated exclusively to fighting insurance fraud and crime, noted in a 2013 report concerning auto thefts that a reduction in vehicle thefts requires an immobilizer.[27] The

---

[26]   *See*   https://www.iihs.org/news/detail/hyundais-kias-are-easy-targets-amidboom-in-vehicle-thefts (last accessed March 21, 2023).
[27] https://www.nicb.org/sites/files/2017-10/2013-Hot-Wheels-Report.pdf (last accessed March 22, 2023).

NICB put it simply: "[g]enerally speaking, if your vehicle can't be started, it can't be stolen."

115.   A study conducted by the HLDI found that immobilizers were standard on 62% of non-Hyundai and Kia vehicles by the introduction of the 2000 model year ("MY") vehicles.[28] By the time 2015MY vehicles were sold, 96% of non-Hyundai and Kia vehicles were equipped with immobilizers. However, only 26% of Hyundai and Kia vehicles were sold with immobilizers as standard equipment.

116.   Many of the vehicles with PMR exemptions are comparably priced to Hyundai and Kia vehicles. For instance, the MSRP for a 2021 Hyundai Elantra ranges from $19,650 to $28,100, and the MSRP for a 2021 Honda Civic, which includes an engine immobilizer, ranges from $21,050 to $28,100.[29]

**D. The Vehicles Are Theft Prone Defective and Do Not Comply With FMVSS No. 114.**

117.   As the DOT and DOJ found in 1968, amateur thieves stealing cars to go joy-riding make up a significant portion of all auto thefts in America. Moreover, these thieves can steal cars using simple means, such as using a pair of pliers to remove the ignition lock. That is why simple measures, such as the installation of an immobilizer, are so effective at preventing the majority of auto thefts.

118.   But Defendants eschewed this relatively inexpensive antitheft device and designed and/or manufactured the Vehicles with several critical design and/or manufacturing defects that allow thieves to steal Vehicles in a matter of seconds.

119.   In or around 2020, a group of teenagers in Milwaukee, who dubbed themselves the "Kia Boyz," discovered the Theft Prone Defect and began to publicize precisely how to take advantage of the Theft Prone Defect to steal the Vehicles in a

---

[28] Highway Loss Data Institute (HLDI) Bulletin Vol. 38, No. 28 (December 2021), available at https://www.iihs.org/news/detail/hyundais-kias-are-easy-targetsamid-boom-in-vehicle-thefts (last accessed March 22, 2023).
[29] https://www.edmunds.com/hyundai/elantra/2021/ (last accessed Aug. 26, 2022).

matter of seconds.

120.    Contrary to Defendants' statements concerning how they employ the latest technology and safety features in their vehicles, the automotive news website *The Drive* noted that the Theft Prone Defect allows thieves to start the engines and steal the cars with "the same trick [used] on a car from the 1980s."[30]

121.    The Vehicles do not comply with FMVSS No. 114 because they do not contain a meaningful antitheft device, such as an immobilizer or other effective antitheft features that prevent the normal activation of the vehicle's engine without a valid key. Consequently, the Vehicles do not contain starting systems that prevent forward self-mobility of the Vehicles when the key is removed.

**E. Defendants Knowingly Manufactured and Sold Millions of Vehicles That Are Easily Stolen In Less Than Ninety Seconds.**

122.    After considerable public outcry and scrutiny, in 2022, Defendants slowly began to acknowledge that their Vehicles suffer from the Theft Prone Defect, and therefore, are easily stolen. But as detailed herein, Defendants have known or should have known of the Theft Prone Defect long before they sold the Vehicles.

123.    On information and belief, each Defendant was aware of the Theft Prone Defect and the safety risk it posed to Vehicle owners and lessees (as well as bystanders), through the following sources, including, but not limited to: (1) their presale testing and Safety Standards self-certification process for the Vehicles; (2) analyses and usage of engine immobilizers in non-Vehicles, their PMP petitions, and usage of engine immobilizers in vehicles sold outside the U.S. market; (3) monitoring of Vehicle thefts; and (4) monitoring of customer complaints, dealership records, warranty claims, and replacement parts orders.

124.    Further, on information and belief, given the corporate relationships

---

[30]https://www.thedrive.com/news/how-thieves-are-stealing-hyundais-and-kiaswith-just-a-usb-cable (last accessed Aug. 26, 2022).

between Defendants, each of them shared the underlying facts on an ongoing basis in real time, and that should have notified them of the Theft Prone Defect.

**1. Defendants should have uncovered the Theft Prone Defect through its FMVSS self-certification process and pre-sale testing.**

125.   Defendants are experienced in the design and manufacture of consumer vehicles. As experienced manufacturers, Defendants are aware of applicable Safety Standards, including FMVSS No. 114. Under 49 U.S.C. § 30115, Defendants are required to certify that each of their vehicles "complies with applicable motor vehicle safety standards."

126.   On information and belief, Defendants employ consultants and engineers that are knowledgeable of FMVSS No. 114 and who are involved in the design, manufacturing, and testing of the Vehicles prior to sale to ensure compliance with the Safety Standard.

127.   HMC states that it conducts "preemptive quality and safety measures from the vehicle development stage."[31]

128.   HMC touts its robust Product Quality Management systems, "based on its "quality philosophy of 'producing defect-free vehicles that will never break down' backed by cutting-edge safety technologies:"[32]

> **Establishing Quality Management System** Hyundai seeks to create "customer safety" values by securing leading quality standards in the global market and strengthening

---

[31] https://www.hyundai.com/content/dam/hyundai/ww/en/images/company/sustainability/about-sustainability/hmc-2022-sustainability-report-social-en.pdf (last accessed August 24, 2022).

[32] https://www.hyundai.com/content/dam/hyundai/ww/en/images/company/sustainability/about-sustainability/hmc-2022-sustainability-report-social-en.pdf (last accessed Aug. 26, 2022).

COMPLAINT FOR DAMAGES

Case No.

quality management through technical preventive quality activities, among other initiatives. We have established a company-wide integrated quality management system to satisfy customers' diverse quality and safety requirements, …..

**Quality Management Standards and Techniques**

Hyundai has introduced and applied quality management techniques to strengthen its market competitiveness on the basis of "defect-free quality". Our quality management techniques, aimed at providing customers with vehicles of the very highest quality in all fields, such as R&D, production, sales, and services, are supported by the best experts in each field (Man); optimal equipment (Machine); the best parts (Material); the best method (Method); thorough verification (Measurement); and commitment to defect free quality (Moral). ….. We also make continuous efforts to upgrade quality management standards and criteria based on the data collected and analyzed in quality risk management processes, such as quality checks, case studies, and improvements.

**Preemptive Management of Quality Risks** From the early design stage of new vehicle development, Hyundai preemptively inspects and manages parts suppliers as well as its own production process quality. Based on product drawings, we conduct a comprehensive review of parts in terms of functions, structures, reliability, and durability, while carefully analyzing our own processes and those of

suppliers before issuing the final approval, thereby eliminating quality risks throughout production processes in advance. In addition to our own verification of test vehicles, Hyundai relies on the test drive opinions of customers and professional quality organizations to identify major issues and carry out improvement activities in parallel. ***Moreover, Hyundai holds quality inspection meetings on regular basis, and in particular, on the verge of new car models' mass production, reports the quality risk assessment results and taken measures to the highest level of management.***

**Quality Risk Assessment – Identification and Improvement** Hyundai has established a control tower devoted to the management of vehicle quality risks in the production process. ***Whenever a quality risk is detected from information acquired through statistical process control, periodic inspections, and shipment pass rates, the control tower takes the lead in conducting joint investigations and taking the necessary countermeasures***. Also, in order to prevent quality risks from occurring in the vehicle production process, we take thorough preventive measures, such as process management by suppliers, assessment of quality prevention activities, validation of quality inspection equipment, and reliability testing of parts.…

**Strengthening Quality Verification Capabilities**

COMPLAINT FOR DAMAGES

Case No.

Hyundai provides annual training on the roles and major tasks involved in securing its pre-manufacturing quality, manufacturing quality, and ***market quality as a way to strengthen the verification capability of its overall quality value chain***. …. In addition, we offer expert courses on quality verification in collaboration with external educational institutions to verify new technologies following the transition to electrification and to strengthen the verification of quality issues from the customer's point of view.

129.   Through this testing and as part of their 49 U.S.C. § 30115 self-certification process, Defendants should have uncovered the Theft Prone Defect.

**2.   Defendants' specific knowledge concerning the efficacy of engine immobilizers and their use of immobilizers in other vehicles should have notified them of the Theft Prone Defect.**

130.   Defendants have long been aware of the efficacy of immobilizers and other antitheft technology that Defendants employ in other vehicles that they make and distribute.

131.   HMC and KC sell the very same, or substantially similar, vehicles to the vehicles in other countries which have engine immobilizers. For example, in the 2020 Kia Sportage Owner's Manual for Canada, Kia notes that the "vehicle is equipped with an electronic engine immobilizer system to reduce the risk of unauthorized vehicle use."[33]

132.   Further, Defendants have long known the antitheft and security benefits

---

[33] *See, e.g.,* https://www.destinationkia.com/blogs/1016/wp-content/uploads/2019/07/2020-Kia-Sportage-Owners-Manual.pdf (last accessed Aug. 29, 2022).

offered by immobilizers given that Defendants have incorporated immobilizers as standard technology in select higher-end models and as a feature in higher-end trim packages on other models in the United States.

133.  On March 2, 2007, HATCI, acting on behalf of HMA, petitioned NHTSA for a PMR exemption for the Hyundai Azera vehicle line beginning with MY 2008. *See* 72 Fed. Reg. 39,661 (July 19, 2007). In that petition, Hyundai stated that it "will install its passive antitheft device as standard equipment on the vehicle line. Features of the antitheft device will include a passive immobilizer consisting of an EMS (engine control unit), SMARTRA (immobilizer unit), an antenna coil and transponder ignition keys." This form of immobilizer was transponder based, which was first introduced in 1996, and already standard in Defendants' competitors' vehicles. The petition specifically notes that Hyundai "believes that the GM Pass-Key and Ford Securilock devices contain components that are functionally and operationally similar to its device," which have been shown in theft data from the NCIC to produce "***a clear reduction in vehicle thefts*** after the introduction of the GM and Ford devices." *Id.*

134.  On October 22, 2007, HATCI, on behalf of Hyundai, submitted a petition for PMR exemption for its luxury Hyundai Genesis vehicle line beginning with MY 2009. 73 Fed. Reg. 4,304, 4,305 (Jan. 24, 2008). That same day, HATCI submitted a PMR exemption petition on behalf of KC (then known as Kia Motors Corporation) for its luxury Kia Amanti vehicle line beginning with MY 2009. 75 Fed. Reg. 1,447, 1,448 (Jan. 11, 2010).

135.  Like the Azera petition, HATCI stated that Defendants would install a passive immobilizer consisting of an EMS (engine control unit), SMARTRA 3 (immobilizer unit), an antenna coil and transponder ignition keys standard in the vehicle lines. *Id*. In both petitions, HATCI again touted the success of immobilizers in GM and Ford vehicles in reducing auto thefts. *Id*. In particular, HATCI reiterated the same statistics touting immobilizers:

STUTMAN

> ***[Hyundai and HATCI] provided theft rate data for the Chevrolet Camaro and Pontiac Firebird vehicle lines showing a substantial reduction in theft rate comparing the lines between pre- and post introduction of the Pass-Key device.*** [Hyundai and HATCI] also provided "percent reduction" data for theft rates between pre- and postproduction years for the Ford Taurus and Mustang, and Oldsmobile Toronado and Riviera vehicle lines normalized to the three-year average of the Camaro and Firebird pre-introduction data. ***[Hyundai and HATCI] stated that the data shows a dramatic reduction of theft rates due to the introduction of devices substantially similar to the [Hyundai and Kia] immobilizer device.*** Specifically, the Taurus, Mustang, Riviera and Toronado vehicle lines showed a ***63, 70, 80 and 58 percent theft rate reduction respectively between pre- and post introduction of immobilizer devices as standard equipment on these vehicle lines.***

*Id.*

136.   In a petition filed by Hyundai in 2009 for its VI vehicle line, beginning with MY 2011, Hyundai stated it will "install its passive Smart-key Immobilizer device and alarm system (audible and visual) on the VI vehicle line as standard equipment." 75 Fed. Reg. 6,253 (Feb. 8. 2010). In support of its petition, Hyundai relied on an "April 2006 report by JP Research, Inc., which concluded that antitheft devices were consistently much more effective in reducing thefts when compared to parts marking."

137.   In particular, the cited JP Research report found that vehicle lines containing antitheft devices "***were 70% more effective than parts marking in***

*deterring theft*." Hyundai's petition also relied on theft data from other manufacturer's vehicle lines (Lincoln Town Car, Chrysler Town and Country, Mazda MX–5 Miata and Mazda 3) that have been exempted from the theft prevention standard. Hyundai noted that "[t]heft rates for the Lincoln Town Car, Chrysler Town and Country, Mazda MX–5 Miata and Mazda 3 all are below the median theft rate of 3.5826." Further, Hyundai touted the success of its immobilizers in its Azera model, stating:

> Hyundai also compared the theft rates for its Azera model which has been installed with an antitheft device as standard equipment since (MY 2006) and was granted an exemption from the theft prevention standard in MY 2008 to the overall theft rate reported by NHTSA for model years (MYs') 2006 and 2007. The theft rate for the MY 2006 Hyundai Azera was 0.7758 which was comparatively lower than the overall theft rate of 2.08 for MY 2006. The theft rate for the MY 2007 Azera was 1.8003, also comparatively lower than the overall theft rate of 1.86 for MY 2007. **Conclusively, Hyundai stated that it believes the data indicate that installation of antitheft devices are effective in reducing thefts**.

138.    On September 8, 2016, and January 22, 2017, HATCI, on behalf of HMA and KA, respectively, submitted PMR exemption petitions for two hybrid electric vehicle lines, the MY 2017 Hyundai Ioniq and the MY 2018 Kia Niro. *See* 82 Fed. Reg. 22,051, 22,048 (May 11, 2017) 82 Fed. Reg. 22,048 (May 11, 2017). As part of these petitions, HATCI again touted the JP Research Report's conclusion that antitheft devices "were 70% more effective than parts marking in deterring theft."

139.    Accordingly, Defendants possessed, analyzed, and explicitly relied on

factual data pertaining to the rate of thefts in vehicles with and without immobilizers. Moreover, Defendants' PMR petitions show that they were aware that immobilizers had become standard safety components in the industry and meaningfully eliminated the risk of thieves bypassing ignition locks.

140.   Defendants thus were keenly aware of the disparate risk created by their decision not to install immobilizers in the Vehicles years before the first Vehicle was sold and the current theft epidemic began to plague consumers nationwide, including Plaintiffs' Insureds.

**3. Defendants were on notice of the Theft Prone Defect from their efforts to monitor Vehicle thefts, which have occurred at a shocking rate.**

141.   In addition to the research cited in Defendants' PMR petitions, publicly available information concerning vehicle thefts in the United States over the last decade notified Defendants as to the extent of the issue created by the Theft Prone Defect.

142.   For years, the Vehicles have suffered high rates of thefts. But the number of reported Vehicle thefts skyrocketed in 2020 when the existence of the Theft Prone Defect began to circulate on social media.

143.   While the rate of Vehicle thefts exploded in 2020, the Vehicles have always suffered from the Theft Prone Defect, and as a result, have been among the most stolen vehicles in the nation for a decade.

144.   Beginning around 2010, Hyundai and Kia started to increase the number of vehicles sold in the U.S.—built upon their marketing campaigns concerning the safety and reliability of their vehicles.

145.   Coinciding with the growth in sales of Hyundai and Kia vehicles and the prevalence of Vehicles on U.S. streets, more and more of Defendants' vehicles began to appear in crime statistics.

146.   Every year since 2007, the NICB publishes its "Hot Wheels" report that

identifies the most stolen vehicles in the United States.[34] The report examines vehicle theft data submitted by law enforcement to the NCIC and determines the vehicle make, model and model year most reported stolen each year. In fact, the NCIC data relied on by the NICB was utilized by Defendants when seeking PMR exemptions. *See* 72 Fed. Reg. 39,661.

147. Hyundai and Kia Vehicles have been listed within the top ten stolen cars since 2013.

148. In September of 2022, the HLDI, which collects information on insurance claims, revealed that "2015-2019 Hyundai and Kia models are roughly twice as likely to be stolen as other vehicles of similar age."[35]

149. On information and belief, Defendants monitored Vehicle theft rates, including the Hot Wheels reports and the underlying NCIC data.

150. On information and belief, Defendants collected and analyzed their own data sets of theft rates for the Vehicles. For instance, Hyundai cited the theft rate for the Azera model line in its 2009 PMR petition for its VI vehicle line. *See* 75 Fed. Reg. 6,253 (Feb. 8. 2010).

151. On information and belief, Defendants conducted investigations into the Vehicle thefts, which would have shown that the thefts were primarily conducted in a similar manner.

**F. Defendants Have Failed To Adequately Remedy The Theft Prone Defect In All Vehicles.**

143. Defendants have failed to inform Plaintiffs' Insureds that their Vehicles contain the Theft Prone Defect, and have refused to reimburse Plaintiffs and Plaintiffs' Insureds for their losses incurred as a result of the Theft Prone Defect.

---

[34] *See* https://www.nicb.org/news/blog/hot-wheels-americas-10-most-stolenvehicles (last accessed Aug. 26, 2022).

[35] https://www.cnn.com/2022/09/22/business/hldi-hyundai-kia-theft/index.html (last accessed April 10, 2023).

144.   After news of the Theft Prone Defect became common knowledge and an epidemic of vehicle thefts began to take hold over the country, Defendants announced that going forward, they would install immobilizers in all their vehicles. This change would affect certain 2022 model vehicles and all Hyundai and Kia vehicles from 2023 onward.

145.   Defendants' recent change in design does not provide any relief to Plaintiffs and their Insureds who have suffered harm as a result of the Theft Prone Defect.

**G. Fraudulent Omission/Concealment Allegations.**

146.   Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals employed by Defendants responsible for making false and misleading statements regarding the Vehicles. Defendants necessarily are in possession of all of this information. Plaintiffs' claims arise out of Defendants' fraudulent omission/concealment of the Theft Prone Defect, as well as their representations about the quality, reliability, and safety of the Vehicles.

147.   Plaintiffs allege that, at all relevant times, including specifically at the time that Plaintiffs' Insureds purchased their Vehicles, Defendants knew, or were reckless in not knowing, of the Theft Prone Defect; Defendants had a duty to disclose the Theft Prone Defect based upon their exclusive knowledge; and Defendants never disclosed the Theft Prone Defect to Plaintiffs' Insureds or the public at any time or place in any manner prior to 2022.

148.   Plaintiffs make the following specific concealment/omission-based allegations with as much specificity as possible absent access to the information necessarily available only to Defendants.

149.   *Who*: each Defendant (HMA, HMC, KA, and KC) actively concealed and omitted the Theft Prone Defect from Plaintiffs and Plaintiffs' Insureds while simultaneously touting the quality, safety, and dependability of the Vehicles, as

Case No.

alleged herein. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals responsible for such decisions.

150.   **What**: that the Vehicles contain the Theft Prone Defect, as alleged herein. Defendants concealed and omitted the Theft Prone Defect while making representations about the safety, dependability, and other attributes of the Vehicles, as alleged herein.

151.   **When**: Defendants concealed and omitted material information regarding the Theft Prone Defect at all times while making representations about the quality, safety, and dependability of the Vehicles on an ongoing basis, and continuing to this day. Defendants still have not disclosed the truth about the full scope of the Theft Prone Defect in the Vehicles, and when consumers brought their vehicles to HMA and KA dealerships or called Defendants' respective customer service and warranty departments complaining of the Theft Prone Defect, Defendants denied an adequate repair for the Theft Prone Defect and warranty coverage.

152.   **Where**: Defendants concealed and omitted material information regarding the true nature of the Theft Prone Defect in every communication they had with Plaintiffs and Plaintiffs' Insureds and made representations about the quality, reliability, and safety of the Vehicles. Plaintiffs are aware of no document, communication, or other place or thing, in which Defendants disclosed the truth about the full scope of the Theft Prone Defect in the Vehicles prior to 2022. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Defendants' websites. There are channels through which Defendants could have disclosed the Theft Prone Defect, including, but not limited to: (1) point of sale communications; (2) the owner's manual; and/or (3) direct communication to Plaintiffs' Insureds through means such as state vehicle registry lists and e-mail notifications.

153.   **How**: Defendants concealed and omitted the Theft Prone Defect from Plaintiffs and Plaintiffs' Insureds and made representations about the quality, safety,

Case No.

and dependability of the Vehicles. Each Defendant actively concealed and omitted the truth about the existence, scope, and nature of the Theft Prone Defect from Plaintiffs and Plaintiffs' Insureds at all times, even though they each knew about the Theft Prone Defect and knew that information about the Theft Prone Defect would be important to a reasonable consumer, and Defendants promised in their marketing materials that Vehicles have qualities that they do not have.

154.   *Why*: Defendants actively concealed and omitted material information about the Theft Prone Defect in the Vehicles for the purpose of inducing Plaintiffs' Insureds to purchase and/or lease Vehicles, rather than purchasing or leasing competitors' vehicles, and made representations about the quality, safety, and durability of the Vehicles. Had Defendants disclosed the truth, for example, in their advertisements or other materials or communications, Plaintiffs' Insureds (and all reasonable consumers) would have been aware of it, and it is reasonably likely that Plaintiffs' Insureds would not have bought or leased the Vehicles or would not have paid as much for them.

**H. Privity Exists Between Defendants and Plaintiffs' Insureds.**

155.   Plaintiffs' Insureds purchased and/or leased their respective Vehicles from Defendants, through Defendants' authorized dealerships, with the understanding that these dealerships were acting on behalf of Defendants, or were otherwise expected to be the eventual purchasers of the Vehicles when bought from a third party.

156.   The sole and express purpose that each authorized Kia and Hyundai dealership has when it acquires vehicles from Defendants is to immediately re–sell them to end–users like Plaintiffs' Insureds. Defendants' conduct, and the conduct of their respective dealerships, thus created a justifiable belief on the part of Plaintiffs' Insureds that the dealerships are agents of Defendants, which the Plaintiffs' Insureds relied on to their detriment. Thus, each Hyundai and Kia dealership operates as the actual and/or apparent agent of HMA and KMA respectively, which satisfies any privity requirement.

157.   Privity further exists between Defendants on the one hand, and the Plaintiffs' Insureds on the other, by virtue of the express warranties provided through their purchase and/or lease agreements.

158.   Defendants also control various details regarding their respective dealerships' operations through various written agreements, such as: (i) granting each dealership a license to use their respective trademarks and intellectual property; (ii) furnishing each dealership with marketing materials to assist in the sale of their vehicles; (iii) providing training to dealership personnel to assist in their sales activities; and (iv) prohibiting their dealerships from engaging in certain practices that otherwise detract from their respective brands or undermine the sale of their respective vehicles, including the Vehicles.

159.   Plaintiffs' Insureds were the intended and direct beneficiaries of agreements between Defendants and their dealerships regarding sales and leases of the Vehicles, because, upon information and belief, the agreements expressly were made for the direct benefit of Plaintiffs' Insureds as ultimate consumers of the Vehicles.

160.   Moreover, Defendants' false and misleading representations in marketing materials and brochures for each of the Vehicles were intended for car purchasers and lessees, rather than the dealerships themselves.

## **TOLLING OF STATUTES OF LIMITATIONS**

161.   Any applicable statute(s) of limitations have been tolled by HMA's, HMC's, KA's, and KC's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and Plaintiffs' Insureds could not have reasonably discovered the true nature of the Theft Prone Defect because Defendants concealed it. Plaintiffs' claims were thus tolled pursuant to the discovery rule, for fraudulent concealment, and for estoppel.

### A. Discovery Rule

162.   The causes of action alleged herein did not accrue until Plaintiffs'

Insureds discovered that their Vehicles contained the Theft Prone Defect.

163.   As alleged above, Plaintiffs' Insureds had no way of knowing about the Theft Prone Defect in their Vehicles. Defendants concealed their knowledge of the Theft Prone Defect while KA and HMA continued to market and sell the Vehicles as safe, secure, high-quality, and reliable vehicles. To this day, Defendants failed to disclose the full extent of the Theft Prone Defect and the risks faced by Vehicle owners and lessees.

164.   Within any applicable statutes of limitation, Plaintiffs and Plaintiffs' Insureds could not have discovered through the exercise of reasonable diligence that Defendants were concealing the conduct complained of herein and misrepresenting the true qualities of the Vehicles.

165.   Plaintiffs and Plaintiffs' Insureds did not know facts that would have caused a reasonable person to suspect that there was a Theft Prone Defect affecting their Vehicle and an ordinary person would be unable to appreciate that the Vehicle was defective. Even if a Vehicle owner or lessee learns that their Vehicle or another's Vehicle was stolen that owner or lessee, as an ordinary consumer, without sophisticated knowledge of mechanical systems and antitheft devices, would not and could not suspect that the theft of the Vehicle that was stolen was, in fact, attributable to a pervasive Theft Prone Defect because Defendants withheld this information and pointed to their express warranties, which purport to disclaim liability for these damages.

166.   For ordinary consumers, the existence and partial extent of the Theft Prone Defect only came to light after media outlets began to cover the abnormal risk of theft for the Vehicles in or around 2021.

167.   For these reasons, any applicable statutes of limitation have been tolled by operation of the discovery rule with respect to the claims in this litigation.

**B. Fraudulent Concealment**

168.   As the manufacturers, distributors, sellers, and/or warrantors of the

Vehicles, Defendants were under a continuous duty to disclose to Plaintiffs' Insureds the existence of the Theft Prone Defect found in the Vehicles.

169.   Defendants were and remain under a continuing duty to disclose to Plaintiffs' Insureds the true character, quality, and nature of the Vehicles, that the Theft Prone Defect found in the Vehicles will allow unsophisticated thieves—even juveniles—to steal the vehicle in less than two minutes, that they will require costly repairs, pose safety concerns, and may cause damage to their personal property.

170.   Instead of publicly disclosing the Theft Prone Defect in the Vehicles, Defendants kept owners and lessees in the dark about the Theft Prone Defect present in their vehicles. To this day, Defendants have knowingly or recklessly failed to disclose the full extent of the Theft Prone Defect, including that the Vehicles do not comply with FMVSS No. 114, and have failed to offer adequate remedies for the Theft Prone Defect.

171.   Until the Theft Prone Defect was exposed to the public through media coverage as the epidemic exploded in 2021, Plaintiffs and Plaintiffs' Insureds had no actual or presumptive knowledge of facts sufficient to put them on inquiry notice of such a connection. In particular, Plaintiffs' Insureds did not possess the aggregate data concerning vehicle thefts, which was beginning to cluster in specific areas around the United States, or the technical data related to the design of the Vehicles, which has ultimately led to this crisis.

172.   Due to each Defendant's concealment throughout the time period relevant to this action, all applicable statutes of limitation have been tolled.

**C. Estoppel**

173.   Defendants were, and are, under a continuous duty to disclose to Plaintiffs' Insureds the true character, quality, and nature of the Vehicles. Defendants failed to disclose the existence of the Theft Prone Defect and actively concealed the true character, quality, and nature of the Vehicles while knowingly making representations about the quality and reliability of the Vehicles. Plaintiffs' Insureds

reasonably relied upon each Defendant's knowing and affirmative representations and/or active concealment of these facts.

## CLAIMS FOR RELIEF

## COUNT I

## BREACH OF IMPLIED WARRANTY

### *Plaintiffs v. All Defendants*

174.  Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

175.  Defendants were, at all relevant times: the manufacturers, distributors, and warrantors of the Vehicles; "merchants" of motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c); "sellers" of motor vehicles under Cal. Com. Code § 2103(1)(d); and "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

176.  In the alternative, if Defendants were not the sellers of the Vehicles to Plaintiffs' Insureds, then Plaintiffs' Insureds were the intended third-party beneficiaries of any and all sales contracts in which one or more Defendant sold Vehicles to Kia and Hyundai dealers or others with the intent that they be resold to consumers, including Plaintiffs' Insureds.

177.  Plaintiffs' Insureds who purchased Vehicles are "buyers" within the meaning of Cal. Com. Code § 2103(1)(a).

178.  Plaintiffs' Insureds who leased Vehicles are "lessees" within the meaning of Cal. Com. Code § 10103(a)(14).

179.  Plaintiffs, upon making payments to their Insureds for damages and losses which they sustained, and which were covered under the insurance policies issued to them by the Plaintiffs, acquired the rights of their Insureds under policy provisions and by operation of law. Accordingly, Plaintiffs "stand in the shoes" of their Insureds and are authorized to pursue all claims and causes of action belonging to their Insureds against third parties such as the Defendants herein who are legally liable for having caused the damages paid by the Plaintiffs.

180.   The Vehicles were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

181.   Defendants knew or had reason to know of the specific use for which the Vehicles were purchased or leased.

182.   Defendants provided Plaintiffs' Insureds with an implied warranty that the Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold.  *See* Cal. Com. Code §§ 2314 and 10212.

183.   This implied warranty included, among other things, a warranty that the Vehicles manufactured, supplied, distributed, and sold by Defendants were safe and reliable for providing transportation, would not be vulnerable to an abnormally high risk of theft, and complied with applicable federal and state law and regulations, including FMVSS 114.

184.   Defendants' warranties were designed and intended for the benefit of Plaintiffs' Insureds as the ultimate consumers and users of the Vehicles.

185.   It is reasonably likely that Plaintiffs' Insureds relied on the existence and length of the implied warranties in deciding whether to purchase or lease the Vehicles.

186.   However, the Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Vehicles were defective and not in merchantable condition, and were not reasonably reliable, safe, and secure transportation at the time of sale or thereafter because, *inter alia*, the Vehicles were plagued by the Theft Prone Defect, lacking any antitheft features or design elements to provide an adequate theft deterrent, or sufficient to satisfy FMVSS 114, resulting in a severe and highly dangerous risk of vehicle theft and causing the Vehicles to be prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

187.   Defendants' actions, as complained of herein, breached the implied warranty that the Vehicles were of merchantable quality and fit for their ordinary and

intended use.

188.   Any attempt by Defendants to disclaim or limit the implied warranty of merchantability for their respective Vehicles vis-à-vis consumers is unconscionable and unenforceable. Specifically, Defendants' warranty limitations are unenforceable because Defendants knowingly sold or leased defective Vehicles without informing consumers about the Theft Prone Defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and Plaintiffs' Insureds. Among other things, Plaintiffs' Insureds had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Plaintiffs' Insureds. Additionally, Defendants knew of the Theft Prone Defect at the time of sale.

189.   Furthermore, the circumstances described herein caused Defendants' exclusive or limited remedy to fail its essential purpose such that Plaintiffs Insureds' may seek alternative remedies. Indeed, these breaches of warranties have denied Plaintiffs and Plaintiffs' Insureds the benefit of Plaintiffs' Insureds' bargains, which presupposes they were (or are) able to use the Vehicles in a meaningful manner without the ever–present risk of them being stolen.

190.   Plaintiffs and Plaintiffs' Insureds were excused from providing Defendants with notice and an opportunity to cure the breaches, because notice would have been futile. As alleged throughout Plaintiffs' Complaint, Defendants have long known that the Vehicles contained the Theft Prone Defect; however, to date, Defendants have not instituted an adequate and meaningful repair program with respect to the Vehicles. As such, Plaintiffs and Plaintiffs' Insureds had no reason to believe that Defendants would have adequately repaired the Theft Prone Defect if they presented their Vehicles to Defendants for repair.

191.   As a direct and proximate result of Defendants' breaches of their implied warranties, Plaintiffs and Plaintiffs' Insureds suffered damage, including property

damage and the loss of use the Vehicles, for which the Defendants are liable.

## COUNT II

## VIOLATIONS OF THE CALIFORNIA SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTIBILITY (Cal. Civ. Code §§ 1791.1 and 1792)

### *Plaintiffs v. All Defendants*

192.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

193.   Defendants are "manufacturer[s]" of the Vehicles within the meaning of Cal. Civ. Code § 1791(j).

194.   Defendants are and were at all relevant times "sellers" of motor vehicles under Cal. Civ. Code § 1791(l).

195.   Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Civ. Code § 1791(i).

196.   Plaintiffs' Insureds who purchased Vehicles are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

197.   Plaintiffs' Insureds who leased Vehicles are "lessees" within the meaning of Cal. Civ. Code § 1791(h).

198.   Plaintiffs, upon making payments to their Insureds for damages and losses which they sustained, and which were covered under the insurance policies issued to them by the Plaintiffs, acquired the rights of their Insureds under policy provisions and by operation of law. Accordingly, Plaintiffs "stand in the shoes" of their Insureds and are authorized to pursue all claims and causes of action belonging to their Insureds against third parties such as the Defendants herein who are legally liable for having caused the damages paid by the Plaintiffs.

199.   The Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

200.   Defendants impliedly warranted to Plaintiffs' Insureds that their

Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792.

201.   Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following: (1) pass without objection in the trade under the contract description; (2) are fit for the ordinary purposes for which such goods are used; (3) are adequately contained, packaged, and labeled; and (4) conform to the promises or affirmations of fact made on the container or label.

202.   The Vehicles would not pass without objection in the automotive trade due to the Theft Prone Defect. Because of the Theft Prone Defect, the Vehicles are not in merchantable condition and thus not fit for ordinary purposes.

203.   The Vehicles are not adequately labeled because the labeling fails to disclose the Theft Prone Defect.

204.   The Vehicles do not conform to the promises and affirmations made by Defendants regarding safety, security, quality, and reliability of the Vehicles.

205.   As a direct and proximate result of the breaches of the implied warranty of merchantability by Defendants, Plaintiffs' Insureds' Vehicles were and are defective, and the Theft Prone Defect in their Vehicles was not remedied. Therefore, Plaintiffs and Plaintiffs' Insureds have been damaged.

206.   Pursuant to Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiffs seek damages, and any other just and proper relief available under the Song-Beverly Consumer Warranty Act.

## COUNT III

## VIOLATIONS OF CONSUMERS LEGAL REMEDIES ACT

## CAL. CIV. CODE § 1750, ET SEQ.

### Plaintiffs v. All Defendants

207.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

208.   The California Consumers Legal Remedies Act, Cal. Civil Code § 1750 *et seq.* ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770.

209.   The CLRA applies to Defendants' actions and conduct described herein because it extends to the sale of goods or services for personal, family, or household use.

210.   The Vehicles are "goods" within the meaning of Cal. Civ. Code § 1761(a).

211.   Defendants, Plaintiffs, and Plaintiffs' Insureds are "persons" within the meaning of Cal. Civ. Code § 1761(c).

212.   At all relevant times, Plaintiffs' Insureds were "consumers" as defined in Civil Code § 1761(d). Plaintiffs, upon making payments to their Insureds for damages and losses which they sustained, and which were covered under the insurance policies issued to them by the Plaintiffs, acquired the rights of their Insureds under policy provisions and by operation of law. Accordingly, Plaintiffs "stand in the shoes" of their Insureds and are authorized to pursue all claims and causes of action belonging to their Insureds against third parties such as the Defendants herein who are legally liable for having caused the damages paid by the Plaintiffs.

213.   Thus, the consumer transactions which were entered into by Plaintiffs' Insureds have created rights, claims and causes of action which are vested in the Plaintiffs, who under contractual and common law principles of subrogation, may enforce these rights of action in the same way as Plaintiffs' Insureds.

214.   The transactions from which this action arise include transactions involving the sale or lease of goods or services for personal, family or household purposes within the meaning of Civil Code § 1761(d).

215.   Defendants developed, manufactured, marketed, and sold the Vehicles

Case No.

containing the defects as alleged herein.

216. Defendants developed, manufactured, marketed, and sold the Vehicles to Plaintiffs' Insureds despite knowledge of the defects and the serious safety risks created by the defects.

217. Defendants made misleading representations and omissions concerning the benefits, performance, and safety of the Vehicles.

218. Defendants marketed and sold the Vehicles as safe despite knowledge that the defects posed serious safety risks to consumers, as well as the general public.

219. Defendants failed to disclose the existence of defects and safety risks that were known to Defendants but hidden from consumers.

220. Defendants' knowing concealment of the unreasonable safety risks associated with the Vehicles constituted misrepresentations, omissions and concealments of material fact that amount to unfair and deceptive practices in violation of the CLRA.

221. Defendants violated the CLRA not only when they sold the Vehicles and misrepresented the Vehicles to be safe for use, but also when they failed to disclose to Plaintiffs' Insureds that the Vehicles had known defects that posed a serious safety risk to consumers and the public.

222. Defendants' deceptive trade practices were designed to induce Plaintiffs' Insureds to purchase the Vehicles containing the defects and for Defendants to attempt to avoid the cost of replacing the defective Vehicles already in use.

223. Defendants' violations of the CLRA were designed to conceal material facts about the defects and unreasonable safety risks in the Vehicles, in order both to induce Plaintiffs' Insureds to purchase the Vehicles, and for the Defendants to attempt to avoid the enormous business cost of repairing and replacing the vehicles.

224. By engaging in the unfair and deceptive conduct described herein and more fully above, Defendants actively concealed and failed to disclose material facts about their defective vehicles.

225.   In purchasing or leasing the Vehicles, Plaintiffs' Insureds were deceived by Defendants' failure to disclose their knowledge of the defects.

226.   The omissions set forth above regarding the Vehicles are material facts that a reasonable person would have considered important in deciding whether or not to purchase a vehicle made and sold by the Defendants. Indeed, no reasonable consumer would have purchased or leased a Vehicle if they were informed of the defects. Had Defendants disclosed the true quality and nature of the Vehicles, it is reasonably likely that Plaintiffs' Insureds would not have purchased the Vehicles.

227.   Defendants' acts were intended to be deceptive and fraudulent, namely, to market, distribute, and sell their defective vehicles.

228.   Plaintiffs' Insureds suffered an injury in-fact as a direct result of Defendants' violations of the CLRA in that they purchased or leased defective Vehicles.

229.   Defendants' conduct as described herein was and is in violation of the CLRA. Defendants' conduct violates at least the following enumerated CLRA provisions:

(i)    Cal. Civ. Code § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities that they do not have.

(ii)   Cal. Civ. Code § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade if they are of another.

(iii)  Cal. Civ. Code § 1770(a)(9): Advertising goods with intent not to sell them as advertised.

(iv)   Cal. Civ. Code § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

230.   Defendants intentionally and knowingly misrepresented and omitted material facts regarding the Vehicles with an intent to mislead Plaintiffs and

Plaintiffs' Insureds.

231.   In purchasing or leasing the Vehicles, Plaintiffs' Insureds were deceived by Defendants' failure to disclose their knowledge of the defective nature of the Vehicles.

232.   Plaintiffs and Plaintiffs' Insureds had no way of knowing Defendants' representations were false, misleading, and incomplete, or of knowing the true nature of the defective Vehicles.

233.   As alleged herein, Defendants engaged in a pattern of deception and public silence in the face of known defects. Plaintiffs and their Insureds did not, and could not, discover Defendants' deceptive conduct on their own.

234.   Defendants knew or should have known their conduct violated the CLRA. Defendants owed consumers a duty to disclose the truth about the defective Vehicles because the defective condition of the Vehicles created a safety hazard, and Defendants possessed exclusive knowledge of that defective condition; intentionally concealed that defective condition from consumers; and/or made incomplete representations in advertisements and on their websites, failing to warn consumers of the defect. Defendants also knew that the Vehicles were materially compromised by the defects alleged herein.

235.   Defendants had an ongoing duty to disclose that the Vehicles were fundamentally flawed because the defective Vehicles created a safety hazard, and consumers, including the Plaintiffs' Insureds, relied on Defendants' material misrepresentations and omissions regarding the features of the Vehicles.

236.   Defendants' violations caused and continue to cause damages to Plaintiffs and Plaintiffs' Insureds while adversely affecting the public interest.

237.   Plaintiffs and Plaintiffs' Insureds were excused from providing Defendants with notice and an opportunity to cure the breaches, because it would have been futile. As alleged throughout Plaintiffs' Complaint, Defendants have long known that the Vehicles contained the Theft Prone Defect; however, to date, Defendants have

not instituted an adequate and meaningful repair program with respect to the Vehicles. As such, Plaintiffs and Plaintiffs' Insureds had no reason to believe that Defendants would have adequately repaired the Theft Prone Defect if they presented their Vehicles to Defendants for repair.

238.   Defendants' wrongful business practices constituted and constitutes a continuing course of conduct in violation of the CLRA. Pursuant to Cal. Civ. Code § 1782, if Defendants do not rectify their conduct within 30 days, Plaintiffs intend to amend this Complaint to add claims for:

    (i)     Actual damages;

    (ii)    Disgorgement and restitution to Plaintiffs and general public;

    (iii)   Attorneys' fees and costs; and

    (iv)   Other relief that this Court deems proper.

## COUNT IV

### VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW
### CAL. BUS. & PROF. CODE § 17200, ET SEQ.
### *Plaintiffs v. All Defendants*

239.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

240.   Defendants have engaged in unfair competition within the meaning of the California Business & Professional Code § 17200, et seq. ("the California UCL") because Defendants' conduct was unlawful, misleading and unfair, as herein alleged.

241.   The California UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

242.   Defendants' business practices are unlawful because they violate the California Civ. Code, including at least §§ 1668, 1709, 1710, and 1750 et seq., and California Commercial Code § 2313. Defendants' practices, moreover, are unlawful because they violate FMVSS 114, which states: "The purpose of this standard is to

decrease the likelihood that a vehicle is stolen … This standard applies to passenger cars …" The standard provides that without a key, the vehicle must prevent "normal activation of the vehicle's engine or motor" and either "steering, or forward self-mobility." In other words, a key is required in order to start the engine and drive the vehicle. In the U.S., and indeed, worldwide, electronic transmitters and receivers called "immobilizers" are utilized to comply with the US regulatory requirements to prevent the theft of vehicles.

243.   The Defendants violated federal law in intentionally choosing, uniquely among manufacturers selling vehicles in the United States, not to equip the Vehicles with sufficient antitheft features or design elements to prevent the theft of Vehicles without a key. Specifically, Kia and Hyundai have been breaking federal law by continually selling certain of their automobiles that do not comply with FMVSS 114, which the government requires to protect life and property.

244.   In order for consumers to obtain these protections in certain Kia and Hyundai vehicles, Kia and Hyundai force consumers to pay thousands of dollars extra for trim packages which include antitheft protection, but which also include unnecessary features having nothing to do with antitheft protection.

245.   The Vehicles do not contain starting systems with antitheft features or design elements that would prevent forward self-mobility and steering when the key is removed from the starting system, as required by FMVSS 114.

246.   If the Vehicles had been manufactured in compliance with FMVSS 114, as required under federal law, they would not have been stolen because, without a key, the perpetrator would have been unable to start the engine and achieve forward self-mobility and steering.

247.   Immobilizers have been proven to deter auto theft. In fact, a 2016 study reflects use of immobilizers lowering the rate of car thefts by 40% over a ten-year period.

248.   Selling automobiles without immobilizers or any other antitheft feature

or design element sufficient to comply with FMVSS 114 is not only illegal, but unfair to consumers because it exposes consumers to elevated risks of theft without fair warning or justification.

249.   Defendants failed to provide notice that the Vehicles lacked any antitheft feature or design element sufficient to provide an adequate theft deterrent, or otherwise comply with FMVSS 114, and failed to give any notice as to the risks associated with operating or even owning a vehicle that does not comply with FMVSS 114.

250.   Defendants violated the California UCL when they concealed and failed to disclose the serious safety risks to consumers that their Vehicles created; concealed and failed to disclose that their Vehicles were defective when they had a duty to disclose these safety risks; and sold the Vehicles as if they were fit for ordinary purposes and did not present unreasonable safety risks.

251.   Defendants violated the California UCL when they failed to disclose that their Vehicles created serious safety risks and were defective as described herein when they had a duty to disclose the safety risks to consumers and instead falsely misrepresented that their Vehicles were safe for consumer use.

252.   Defendants did not include features or design elements on the Vehicles at issue in this action that would bring those Vehicles into compliance with the letter or intent of FMVSS 114. Thus, Defendants developed, manufactured, marketed and sold their Vehicles in a dangerous and defective condition. This too was unfair to consumers, and therefore violated the UCL.

253.   As is more fully set forth above, Defendants had knowledge of the serious safety risks presented by their Vehicles and had knowledge of their defects prior to their sale to Plaintiffs' Insureds. Indeed, as described above, Defendants have long had notice of the existence of, and reasons for, the federal regulation requiring antitheft features or design elements that prevent either forward self-mobility or steering without a key.

Case No.

254.  The absence of antitheft protection constitutes a safety issue that triggered Defendants' duty to disclose this safety issue to consumers.

255.  Defendants failed to disclose to Plaintiffs and Plaintiffs' Insureds the material fact that their Vehicles posed serious safety risks upon sale and were defective in lacking mandatory antitheft protection. Defendants were in exclusive possession of this knowledge.

256.  Plaintiffs and Plaintiffs' Insureds did not and could not have had knowledge of the safety risks created by the Vehicles at the time that Plaintiffs' Insureds purchased their Vehicles.

257.  Despite their knowledge of the serious safety risks that the Vehicles presented to consumers and the public, Defendants failed to issue an appropriate warning, recall, or a campaign to replace the Vehicles for years, concealing their knowledge both of the defects and the safety issues presented by the Vehicles.

258.  Defendants' business acts were and are unfair, unlawful and fraudulent within the meaning of the California UCL.

259.  As entities with exclusive knowledge regarding the safety risk and defect in the Vehicles, Defendants had a duty to disclose these defects, particularly in light of the fact that the Vehicles posed serious safety risks to Plaintiff's Insureds.

260.  Plaintiffs and Plaintiffs' Insureds reasonably expected that Defendants would have disclosed the existence of both the defects and the serious safety risks that the Vehicles presented to consumers and the public, and reasonably expected that Defendants would not sell a vehicle that was unsafe or sell a vehicle that contained defects in violation of federal regulations. This information is and was material to Plaintiffs and Plaintiffs' Insureds.

261.  Defendants, at all material times, knew or should have known that Plaintiffs and Plaintiffs' Insureds did not know of, or could not have reasonably discovered, the safety risks or the defects in the Defendants' Vehicles.

262.  By concealing the serious safety risks created by their Vehicles and the

existence of these defects, Defendants engaged in actionable, unfair, and fraudulent conduct within the meaning of the California UCL.

263.   Had Plaintiffs' Insureds known of the serious safety risks and the defects in the Vehicles, it is reasonably likely they would not have purchased the Vehicles.

264.   These acts and practices have deceived Plaintiffs and Plaintiffs' Insureds and are likely to deceive the public. In failing to disclose the defect and suppressing other material facts from Plaintiffs and Plaintiffs' Insureds, Defendants breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and Plaintiffs' Insureds. The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiffs' Insureds, as it would have been to all reasonable consumers.

265.   By failing to disclose and concealing the existence of a defect in the Vehicles, Defendants engaged in unfair conduct within the meaning of the California UCL.

266.   Defendants' misconduct is unfair within the meaning of the California UCL as it offends established policy and is immoral, unethical, unscrupulous, and substantially injurious to consumers.

267.   Plaintiffs, who insure property and automobiles, have suffered damages as a result of Defendants' misconduct.

268.   Defendants' unlawful, unfair and fraudulent business acts and practices continue through the date of the filing of this Complaint.

269.   Under the California UCL, Plaintiffs request that this Court enjoin Defendants from engaging in business practices that constitute a violation of the California UCL. Plaintiffs further request that this Court enter such orders or judgments as may be necessary to restore by restitution to any person in interest any value which may have been lost, or incurred by means of such unfair practices, as provided for in Bus. & Prof. Code § 17203 and for such other relief as set forth herein.

# COUNT V

## FRAUD BY OMISSION AND CONCEALMENT

### *Plaintiffs v. All Defendants*

270.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

271.   Defendants were aware of the Theft Prone Defect when they marketed and sold the Vehicles to Plaintiffs' Insureds.

272.   Having been aware of the Theft Prone Defect within the Vehicles and having known that Plaintiffs' Insureds could not have reasonably been expected to know of the Theft Prone Defect, Defendants had a duty to disclose the Theft Prone Defect to Plaintiffs' Insureds in connection with the sale of the Vehicles. Defendants further had a duty to disclose the Theft Prone Defect because:

a. Defendants had exclusive access to and far superior knowledge about facts regarding the Theft Prone Defect and Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs' Insureds;

b. Given the Theft Prone Defect's hidden and technical nature, Plaintiffs' Insureds lack the sophisticated expertise in vehicle components that would be necessary to discover the Theft Prone Defect on their own;

c. Defendants knew that the Theft Prone Defect gave rise to safety concerns for the consumers who use the Vehicles, and the Theft Prone Defect would have been a material fact to the Plaintiffs' Insureds' decisions to buy or lease the Vehicles; and

d. Defendants made incomplete representations about the safety and reliability of the Vehicles while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Vehicle, HMA, and KA intentionally concealed, suppressed, and failed to disclose to the consumers that the Vehicles

Case No.

COMPLAINT FOR DAMAGES

contained the Theft Prone Defect. Because they volunteered to provide information about the Vehicles that they marketed and offered for sale and lease to consumers, HMA and KA had the duty to disclose the whole truth.

273.   In breach of their duties, Defendants failed to disclose the Theft Prone Defect to Plaintiffs' Insureds in connection with the sale of the Vehicles.

274.   For the reasons set forth above, the Theft Prone Defect within the Vehicles is material to the sale of the Vehicles because a reasonable person would find it important in purchasing, leasing, or retaining a new or used motor vehicle and because it directly impacts the value of the Vehicles purchased or leased by the Plaintiffs' Insureds.

275.   Defendants intended for the Plaintiffs' Insureds to rely on their omissions and concealment—which they did by purchasing and leasing the Vehicles at the prices they paid believing that their vehicles would not have a Theft Prone Defect that would affect the quality, reliability, and safety of the Vehicles.

276.   Plaintiffs' Insureds' reliance was reasonable, as they had no way of learning the facts that Defendants had concealed or failed to disclose. Plaintiffs' Insureds did not, and could not, unravel Defendants' deception on their own.

277.   Defendants actively concealed and suppressed these material facts, in whole or in part, to maintain a market for the Vehicles, to protect profits, and to avoid costly recalls that would expose them to liability for those expenses and harm the commercial reputations of Defendants and their products. They did so at the expense of Plaintiffs and Plaintiffs' Insureds.

278.   If Defendants had fully and adequately disclosed the Theft Prone Defect to consumers, Plaintiffs' Insureds would have seen such a disclosure.

279.   Through their omissions and concealment with respect to the Theft Prone Defect within the Vehicles, Defendants intended to induce, and did induce, Plaintiffs' Insureds to either purchase a Vehicle that they otherwise would not have purchased,

Case No.

or pay more for a Vehicle than they otherwise would have paid.

280.   Had Plaintiffs' Insureds known of the Theft Prone Defect within the Vehicles, it is reasonably likely they would not have purchased the Vehicles or would have paid less for them.

281.   As a direct and proximate result of Defendants' omissions, Plaintiffs' Insureds either overpaid for the Vehicles or would not have purchased the Vehicles at all if the Theft Prone Defect had been disclosed to them. Accordingly, Defendants are liable to Plaintiffs and Plaintiffs' Insureds for their damages.

282.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the Plaintiffs' and Plaintiffs' Insureds' rights and well-being; and to enrich themselves.

### COUNT VI

### UNJUST ENRICHMENT

### *Plaintiffs v. All Defendants*

283.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

284.   When they purchased and leased the Vehicles, Plaintiffs' Insureds conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

285.   Upon information and belief, it is reasonably likely that Plaintiffs' Insureds would not have purchased or leased their Vehicles, or would have paid less for them, had they known of the Theft Prone Defect at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Vehicles to the detriment and expense of Plaintiffs' Insureds.

286.   Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Theft Prone Defect, yet they failed to disclose this knowledge and misled the Plaintiffs' Insureds

regarding the nature and quality of the Vehicles while profiting from this deception.

287.   It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

288.   Plaintiffs are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Plaintiffs' Insureds to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

289.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs will have no adequate legal remedy.

## COUNT VII

### BREACH OF IMPLIED WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT – 15 U.S.C. § 2301, *ET SEQ.*

#### *Plaintiffs v. All Defendants*

290.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

291.   Plaintiffs stand in the shoes of their insureds, who are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

292.   Defendants are suppliers and warrantors within the meaning of 15 U.S.C. §§ 2301(4)-(5).

293.   The Vehicles are "consumer products" within the meaning of 15 U.S.C. §2301(1).

294.   Defendants were at all relevant times the manufacturer, distributor, warrantor, and seller of the Vehicles.

295.   In the alternative, if Defendants were not the sellers of the Vehicles to Plaintiffs' Insureds, Plaintiffs' Insureds were the intended third-party beneficiaries of

Case No.
COMPLAINT FOR DAMAGES

any and all sales contracts in which one or more Defendants sold Vehicles to Kia and Hyundai dealers or others with the intent that they be resold to consumers, including Plaintiffs' Insureds.

296. Defendants provided Plaintiffs' Insureds with an implied warranty that the Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold. However, the Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia*, the defective Vehicles lacked any antitheft features or design elements sufficient to satisfy FMVSS 114, or otherwise provide an adequate theft deterrent, resulting in a severe and highly dangerous risk of vehicle theft.

297. Defendants impliedly warranted that the Vehicles were of merchantable quality and fit for their ordinary and intended use. This implied warranty included, among other things, a warranty that the Vehicles manufactured, supplied, distributed, and sold by Defendants were safe and reliable for providing transportation, would not be vulnerable to an abnormally high risk of theft, and complied with applicable federal and state law and regulations, including FMVSS 114.

298. Defendants' warranties were designed and intended for the benefit of the Plaintiffs' Insureds as ultimate consumers of the Vehicles.

299. Contrary to the applicable implied warranties, the Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs' Insureds with reliable, durable, and safe transportation. Instead, the Vehicles suffer from design defect(s) and/or manufacturing defect(s) that render them vulnerable to an abnormally high risk of theft.

300. Defendants' actions, as complained of herein, breached the implied warranty that the Vehicles were of merchantable quality and fit for such use.

301. Defendants' breach of the implied warranties has deprived Plaintiffs' Insureds of the benefit of their bargain.

302. The amount in controversy of Plaintiffs' claims meets or exceeds the sum

or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

303.  Plaintiffs and Plaintiffs' Insureds were not required to provide Defendants with written notice of their claims and an opportunity to cure because affording Defendants a reasonable opportunity to cure their breach of written warranties would have been futile. Defendants were also on notice of the alleged defects from the complaints and service requests it received from consumers, including through NHTSA, as well as from their own warranty claims, customer complaint data, and parts sales data. This is evidenced by Defendants' own statements acknowledging the issue.

304.  As a direct and proximate result of Defendants' breach of their implied warranties, Plaintiffs and Plaintiffs' Insureds suffered damage, including property damage, loss of use damage, consequential damages, and other damages and costs, for which the Defendants are liable, together with statutory attorney's fees and such other relief which the Court deems to be just and appropriate.

## COUNT VIII

## NEGLIGENCE

### *Plaintiffs v. All Defendants*

305.  Plaintiffs incorporate by reference each preceding and succeeding paragraph as if fully set forth at length herein.

306.  Defendants manufactured, distributed and sold the Vehicles.

307.  Defendants violated applicable industry standards and otherwise failed to exercise reasonable care in connection with their manufacture, distribution and sale of the Vehicles.

308.  The Defendants' violation of their duties under applicable law included their failure to comply with federal regulatory requirements to equip their vehicles with mandatory antitheft protection that complies with the requirements of FMVSS 114.

309.   As a result of Defendants' violation of their duties, Plaintiffs and Plaintiffs' Insureds suffered damage, including property damage and the loss of use the Vehicles, together with other damages for which the Defendants are liable.

## COUNT IX

## NEGLIGENT FAILURE TO WARN

### *Plaintiffs v. All Defendants*

310.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as if fully set forth at length herein.

311.   Defendants manufactured, distributed, and sold the Vehicles.

312.   The Vehicles sold to Plaintiffs' Insureds:

    a.  were not merchantable;

    b.  were not reasonably suited to the intended use for which they were sold; and

    c.  were in a defective and unreasonably dangerous condition at the time of sale, by reason of the design of the Vehicles.

313.   Defendants owed Plaintiffs' Insureds a duty to warn with respect to dangers and risks associated with the ordinary and foreseeable use of the Vehicles, particularly when such risks arose from latent and hidden defects of design that could not be detected by Plaintiffs' Insureds in the exercise of any reasonable care.

314.   At all relevant times, including at the time of sale, Defendants knew that the Vehicles were defective because they lacked immobilizers or other anti-heft features or design elements sufficient to comply with FMVSS 114, creating a dangerous risk of vehicle theft, a risk to the safety of consumers and the public, and a risk of property damage and loss.

315.   Defendants breached their duty owed to Plaintiffs' Insureds by failing to provide them with any warnings with respect to the dangers and risks of vehicle thefts and harm to consumers, the public, and property directly resulting from the design of the Vehicles, including the lack of antitheft features and/or design elements that

complied with FMVSS 114.

316.   The failure to warn Plaintiffs' Insureds of the dangers and risks caused by noncompliance with FMVSS 114 was unreasonable, and Defendants' failure to warn was the result of a lack of due care and ordinary diligence.

317.   Defendants' failure to warn Plaintiffs' Insureds regarding the defective and unreasonably dangerous condition of the Vehicles proximately caused damage to Plaintiffs' Insureds resulting from vehicle thefts.

318.   Defendants are liable in tort for negligent failure to warn for the damages caused by and to the Vehicles.

319.   Defendants owe a duty to consumers not to sell dangerous products that create severe risks of vehicle theft, property damage, and harm to the safety of consumers and the public, and to warn consumers of such risks. This duty arises under applicable law and is independent of any contractual obligation.

320.   As a direct and proximate result of Defendants' negligent failure to warn Plaintiffs' Insureds, Plaintiffs and Plaintiffs' Insureds suffered damage, including property damage and the loss of use of the Vehicles, and other damages for which Defendants are liable.

## COUNT X

### NEGLIGENT MISREPRESENTATION

#### *Plaintiffs v. All Defendants*

321.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

322.   Defendants made representations to Plaintiffs' Insureds concerning the safety and quality of the Vehicles that were not true, as more fully alleged in the preceding paragraphs.

323.   Defendants had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs' Insureds rely on the misrepresentations.

Case No.

324.   Plaintiffs' Insureds reasonably relied on Defendants' misrepresentations and, as a direct and proximate result thereof, and Plaintiffs' Insureds suffered damage, including property damage and the loss of use of the Vehicles, and other damages for which the Defendants are liable.

<div align="center">

**COUNT XI**

**STRICT LIABILITY**

***Plaintiffs v. All Defendants***

</div>

325.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

326.   At all material times, Defendants were engaged in the business of designing, manufacturing, maintaining, assembling, inspecting, installing, testing, marketing, packaging, labeling, selling and/or distributing automobiles.

327.   Defendants designed, manufactured, maintained, assembled, inspected, tested, marketed, packaged, labeled, sold and/or distributed the Vehicles at issue herein.

328.   At the time the Vehicles left the possession, custody and control of Defendants, Defendants knew or had reason to know of the use and purpose for which the Vehicles would be utilized.

329.   At the time the Vehicles left the possession, custody and control of Defendants, Defendants knew or had reason to know that selling, supplying and/or distributing defective Vehicles that lacked immobilizers or any other comparable antitheft feature or design element sufficient to comply with FMVSS 114, posed an unreasonably dangerous and high risk of theft.

330.   Defendants owed a duty of care and skill to consumers, including Plaintiffs' Insureds, with respect to the design, manufacture, maintenance, assembly, inspection, testing, marketing, packaging, labeling, selling, and/or distribution of the Vehicles, and to further exercise ordinary and reasonable care to ascertain that the Vehicles were reasonably fit, suitable and safe for their intended and reasonably

Case No.

foreseeable purposes.

331.   At the time the Vehicles left the possession, custody and control of Defendants, Defendants had a duty to exercise reasonable care in issuing adequate and sufficient instructions and warnings to consumers, including Plaintiffs' Insureds, regarding the hazards posed by defects within the Vehicles, namely the Vehicles' lack of immobilizers or any other comparable antitheft feature or design element sufficient to comply with FMVSS 114, and the resulting unreasonably dangerous and high risk of theft.

332.   At the time the Vehicles left the possession, custody and control of Defendants, the Vehicles were in an unreasonably dangerous and defective condition and were unfit, unsuitable and unsafe for their intended purposes.

333.   Defendants failed to inform Plaintiffs' Insureds as to the Vehicles' lack of immobilizers or any other comparable antitheft feature or design element sufficient to comply with FMVSS 114, and their susceptibility to being stolen.

334.   Defendants, after learning that the Vehicles did not comply with FMVSS 14 and were unreasonably susceptible to being stolen, had a post-sale duty to warn consumers, including Plaintiffs' Insureds, regarding the unreasonably dangerous nature of the Vehicles and their high risk of theft.

335.   As a direct, proximate and foreseeable result of the aforesaid negligent, careless, willful, wanton, malicious, grossly negligent and/or reckless acts and/or omissions of Defendants, acting by and through their agents, servants and/or employees in the course and scope of their employment, Plaintiffs and Plaintiffs' Insureds' sustained damages, including property damage and loss of use damages, and other damages and expenses for which Defendants are liable.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against Defendants, and each of them, as to each cause of action as follows:

a.   Payment to the Plaintiffs for all damages resulting from the replacement

Case No.
COMPLAINT FOR DAMAGES

or repair of the defective Vehicles, in an amount to be proven at trial;

b.  Payment to the Plaintiffs for all damages resulting from property damage, loss of use damage, or other damages caused by use or theft of Defendants' defective Vehicle;

c.  Restitution as authorized by law;

d.  An award of reasonable attorneys' fees and costs, as provided and permitted by law;

e.  Interest as provided by law, including but not limited to pre-judgment and post-judgment interest; and

f.  Such other and further relief as this Court may deem just, equitable, or proper.

///

## **JURY TRIAL DEMANDED**

Plaintiffs, by their counsel, request a trial by jury on those causes of actions set forth herein.

DATED:  May 5, 2023          LAW OFFICES OF ROBERT A. STUTMAN,  P.C.

By: _____

Timothy E. Cary, Esq.
Attorney for Plaintiffs

STUTMAN